1
2
3                           UNITED STATES DISTRICT COURT
4                                  DISTRICT OF NEVADA
5                                        * * *
6    FRANK ZANINI,                              Case No. 3:18-cv-00336-MMD-CSD
7                            Petitioner,
                                                ORDER
     v.
8
     TIM GARRETT,[1] *et al.*,
9
                            Respondents.
10
11   **I.    SUMMARY**

12          Petitioner Frank Zanini filed a second amended petition for writ of habeas corpus

13   under 28 U.S.C. § 2254 (ECF No. 36 ("Petition")). A jury convicted Zanini of three counts

14   of sexual assault of his niece, J.Z.,[2] and he is sentenced to imprisonment for 70 years to

15   life. (ECF Nos. 10-3, 10-5.)[3] In the remaining grounds of the Petition, Zanini seeks habeas

16   relief based on claims of evidentiary error, prosecutorial vouching, *Brady*[4] violations,

17

18   _____

19          [1]According to the state corrections department's inmate locator page, Zanini is
     incarcerated at Lovelock Correctional Center. The department's website reflects Tim
20   Garrett is the warden for that facility. *See* https://doc.nv.gov/Facilities/LCC_Facility/. The
     Court will therefore direct the Clerk to substitute Tim Garrett for Respondent Warden
     Baker, under, *inter alia,* Fed. R. Civ. P. 25(d).
21
            [2]The Local Rules of Practice state: "[p]arties must refrain from including—or must
22   partially redact, where inclusion is necessary—[certain] personal-data identifiers from all
     documents filed with the court, including exhibits, whether filed electronically or in paper,
23   unless the court orders otherwise." LR IA 6-1(a). This includes the names of minor
     children, thus, only a child's initials should be used. *Id.* Witnesses referred to herein as
24   "J.Z.," "M.G.," and "T.A." were minors at the time of the offenses and when they testified
     at trial.
25
            [3]Zanini was charged with 17 counts of sexual assault. (ECF No. 90-8.) He was
26   convicted on Counts 1-2 and 17; found not guilty on Counts 8 and 14; and the jury did not
     reach a verdict on Counts 3-7, 9-13, and 15-16. (ECF No. 10-32.) Counts 1 and 2 alleged
27   Zanini had sexual intercourse with J.Z. when she was under 16 years old and Count 17
     charged the same when she was under 14 years old. (ECF No. 10-5.)
28
            [4]*Brady v. Maryland*, 373 U.S. 83 (1963).

improper amendment of the information, and ineffective assistance of trial counsel.[5] For the reasons discussed below, the Court will dismiss with prejudice Grounds 8(A), 10(B), 10(C); deny federal habeas relief for Grounds 1, 3-7, 8(B), part of 9, 10(A), and 10(D); deny the Petition (ECF No. 36); and issue a Certificate of Appealability for portions of Ground 9.

## II.    BACKGROUND[6]

### A.    J.Z.'s History of Sexual Assault Allegations

J.Z.[7] testified that when she was 5 years old, she told someone that her father had molested her, and he went to prison after pleading guilty. (ECF No. 90-6 at 9.) J.Z. said her parents relinquished parental rights and she and her brother, Ronald "Ronnie" Zanini, were adopted by their paternal grandparents when she was around 6 years old. (*Id.* at 5-6, 9, 14.) J.Z. said that during the time she lived with her grandparents, she vacationed, sometimes lived with, and often spent weekends, at the home of her paternal uncle, Zanini, and his wife, Margaret "Margie" Zanini. (*Id.* at 26-29.)

J.Z. testified that in September of 2007, when she was 14 years old, she told school police that Timothy Duzubiak raped her because she had started bleeding and thought she was pregnant, but after she learned she was not pregnant, she recanted the accusation, saying she and Duzubiak had consensual sex. (*Id.* at 200-03.) J.Z. testified she also told police her encounter with Duzubiak was her first consensual sexual experience; however, she admitted that was a lie because, at the time she made that

---

[5]The Court dismissed Ground 2 of the Petition as procedurally defaulted, and deferred consideration of whether Zanini can overcome the procedural default of his claims in Grounds 8(A), 10(B), and 10(C). (ECF No. 64 at 15.)

[6]The Court summarizes the relevant state court record for consideration of the issues in the case. The Court makes no credibility findings or other factual findings regarding the truth or falsity of evidence or statements of fact in the state court. The Court summarizes the same solely as background to the issues presented in this case. No assertion of fact made in describing statements, testimony, or other evidence in the state court constitutes a finding by this Court. Any absence of mention of a specific piece of evidence or category of evidence does not signify the Court overlooked the evidence in considering the claims.

[7]At trial, J.Z. testified she was 16 years old, and pregnant, and said she started menstruating when she was 11 years old. (ECF No. 90-6 at 4, 63, 88.)

1  statement, she was in a consensual sexual relationship with a 40-year-old man named

2  Byron Peery.[8] (*Id.* at 204.) J.Z. testified that her grandmother called police about the

3  relationship with Peery, and J.Z. said she initially lied to police, telling them she did not

4  have a sexual relationship with him. (*Id.* at 189-91.)

5      J.Z. testified she ran away from her grandparents' house in November of 2007

6  because she "kept getting grounded" and "did not want to be grounded," and that police

7  located her at Peery's house. (*Id.* at 26, 30-33, 192-93, 200.) She said that this time, she

8  told police she had a sexual relationship with Peery, and thereafter, without her having to

9  testify, Peery went to jail after pleading guilty to sexual seduction. (*Id.*)

10     J.Z. testified that, after her removal from Peery's house, she did not want to return

11 to her grandparents' home because she knew she would get in trouble; so, when police

12 told her they needed a reason not to return her to her grandparents' home, she told them

13 her paternal grandfather had molested her when she was 6 years old. (*Id.* at 21, 26, 33-

14 34, 194-96.) J.Z. admitted that she did not at that time tell police about any sexual abuse

15 by Zanini**,** although she did tell them her father and grandfather had molested her,

16 Duzubiak raped her, and she had a sexual relationship with Peery and another unnamed

17 individual. (*Id.*) J.Z. claimed she had previously disclosed her grandfather's abuse to her

18 friend, T.A., and told T.A. not to tell anyone about it. (*Id.* at 34-35.)

19     J.Z. said her allegations against her grandfather prompted the removal of two

20 foster babies from her grandparents' home, and that she recanted the allegations so the

21 foster babies would be returned to them. (*Id.* at 19-21, 35-39.) At Zanini's trial, however,

22 J.Z. recanted that recantation by asserting her grandfather had molested her. (*Id.* at 23-

23 25, 34.) She said she asked him to admit it to her grandmother so her grandmother would

24 stop hating her and thinking she lied about it, but her grandfather told her he couldn't tell

25 her grandmother "because they've been in love so long it would kill her." (*Id.* at 43.)

26     **B.    J.Z. accused Zanini of sexually abusing her for many years.**

27     J.Z. testified that in January of 2008, when she was 15 years old, she kept

28

_____

[8]The trial transcript incorrectly refers to Peery as Perry. (ECF No. 90-2 at 7.)

1    "getting in trouble" and "didn't want to stay [at her grandparents' house] anymore." (*Id.*

2    at 25-26.) J.Z. testified that, with her consent, and during the time that Zanini was

3    sexually abusing her, she was permitted to move in with Zanini and Margie. (*Id.* at 14-

4    19, 44-46, 182, 197-98.) J.Z. said she was thereafter expelled from two schools. (*Id.* at

5    168-69.)

6    　　　　J.Z. testified that in July of 2008, she ran away from Zanini and Margie's house

7    after she and Margie had an argument during which Margie "smack[ed]" J.Z., and Zanini

8    and Margie grounded J.Z. and told her it was her "last chance" with them and mentioned

9    "bootcamp." (*Id.* at 46-56, 147-48.) J.Z. said she went to the home of her friend, Jessie,

10   and Jessie's husband, Charles, told them "what happened" "with [her] uncle," and they

11   took her to Henderson Police the next morning "to turn in [her] uncle" for sexually abusing

12   her because J.Z. said she "didn't want it to happen anymore." (*Id.* at 56-60, 148-49, 231-

13   32.) J.Z. said she met with Detective Amber Swartwood and honestly relayed to her as

14   much as she could recall about Zanini's sexual abuse. (*Id.* at 60-62.) She admitted that

15   she asked if she could live with Jessie and Charles. (*Id.* at 167.)

16   　　　　Henderson Police Detective Amber Swartwood of the Special Victims Unit testified

17   she tape-recorded her interview with 15-year-old J.Z. on July 17, 2008. (ECF No. 90-7 at

18   184-85, 187-90.) Swartwood said J.Z. told her Zanini sexually assaulted her about once

19   a month while she was between the ages of 8 and 12 years old, and about twice a month

20   when she was between the ages of 12 and 15 years old, with the most recent incident of

21   assault in July of 2008. (*Id.* at 189-91, 194.) Swartwood said J.Z. told her about 11 specific

22   instances of sexual assault that included acts of cunnilingus, digital penetration, fellatio,

23   and sexual intercourse. (*Id.* at 199-91, 194-96, 205-09.) Swartwood summarized the 11

24   incidents, including specific acts of sexual intercourse involving (1) a red plaid dog bed;

25   (2) the living room floor; (3) a car; (4) a recliner in the garage; (5) a green paisley

26   comforter; (6) J.Z.'s Tweety Bird comforter; and (7) a white blanket. (*Id.*)

27   　　　　Henderson Police Department crime scene analyst Joy Self testified she collected

28   carpet samples to the West of J.Z.'s bed, a "white-ish colored" blanket, and a Tweety Bird

1    comforter from J.Z.'s bedroom in Zanini's home in July of 2008. (*Id.* at 143-57, 167-68,

2    175; *see also* ECF No. 8.) Las Vegas Metropolitan Police Department DNA analyst

3    Jennifer Bas testified the Tweety Bird comforter was negative for blood and semen, but

4    the carpet and white blanket were positive for Zanini's semen and sperm.[9] (*Id.* at 32, 36-

5    50.) Bas agreed it is normal to find a person's DNA on items in their home and it is

6    impossible to determine to a reasonable degree of certainty when or how long DNA was

7    deposited in a particular location. (*Id.* at 57, 72-73.)

8          **C.    J.Z. recanted the allegations against Zanini before trial.**

9          The District Attorney's investigator, Craig Fabert, testified he listened to jail calls

10    between Zanini and family members, and in one of the calls, Zanini said the only way

11    anything is going to work out is if [J.Z.] recants her story, followed by his statement,

12    "[o]therwise, I'll be in jail for the rest of my life for something I didn't do because that little

13    bitch lied so she didn't have to go to boot camp, which she should have know[n] we would

14    have never F'ing done." (ECF No. 90-9 at 312.)

15          At trial, J.Z. testified her allegations caused problems in the family and her brother,

16    Ronnie, wanted her to say nothing happened. (ECF No. 90-6 at 64-65.) Ronnie testified

17    that, in his opinion, J.Z. is "not very truthful." (ECF No. 90-9 at 152.) He said she told him

18    the allegations were true, but also told him they were false. (*Id.* at 153.) At Zanini's

19    instruction, Ronnie said he told J.Z. to recant her story, but denied telling her to lie or

20    threatening her if she did not recant the allegations. (*Id.* at 140-42, 154-56.) J.Z.'s

21    grandmother testified she took J.Z. to defense counsel's office, that J.Z. wanted to go,

22

23          [9] In closing remarks, defense counsel argued the carpet sample was not taken
      from a location near the bedroom door:

24

25                Additionally, there was DNA evidence found on the floor of the
            bedroom that [J.Z.] stayed in, lived in for those six months. But it was found
26            over by the computer. If you'll recall that picture of where they cut the, and
            you'll get the pictures with you, where they cut the carpet out from the floor,
27            it was over near the computer desk. It was not on the floor where [J.Z.] said
            the one incident of sexual abuse had occurred on the floor, which was over
28            by the door.

      (ECF No. 90-10 at 47.)

1    and neither she nor Ronnie forced J.Z. to do so. (*Id.* at 199.)

2         J.Z. testified she and her grandmother went unannounced to defense counsel's
3    office on August 28, 2009, and she told defense counsel the abuse never occurred, and
4    she wished to recant her allegations. (ECF No. 90-6 at 65-66, 149-51, 185.) She agreed
5    she told defense counsel (and later Detectives Swartwood and Abernathy) that she did
6    not want Zanini to be in jail for something he did not do and just because she was mad at
7    him. (*Id.* at 155, 159, 164-66.) She agreed defense counsel and the defense investigator
8    never threatened or pressured her. (*Id.* at 184.)

9         On cross-examination, J.Z. testified that, after her recantation to defense counsel,
10   the prosecutor visited her at school. (*Id.* at 151-52.) She said Detectives Swartwood and
11   Abernathy later visited her at her home, told her the recantation was a lie, and asked her
12   whether anyone in the family, particularly Ronnie or her grandmother, had influenced her
13   to recant the allegations. (*Id.* 151-57.) J.Z. testified she told the detectives her recantation
14   was the truth, and her initial allegations were a lie. (*Id.* at 154, 159.) J.Z. said she told the
15   detectives she felt it was wrong for Zanini to be in jail for something he didn't do or to be
16   in jail just because she got mad at him, but the detectives told her they were not there to
17   talk about that. (*Id.* at 154-55, 165-66.) J.Z. said the detectives kept asking if Ronnie was
18   threatening her and she kept telling them "No." (*Id.* at 155-57.) She said Detective
19   Abernathy said she initially told Swartwood things that confirm the recantation is a lie.
20   (*Id.*)

21        J.Z. further testified that during the post-recantation interview, the detectives told
22   her that if she lied on the witness stand, her baby wouldn't be safe, and she would be
23   charged with perjury, go to juvenile hall, have the baby there, and her baby would go to
24   Child Haven or foster care. (*Id.* at 158.) J.Z. agreed that this warning caused her to later
25   ask defense counsel about the penalty for perjury. (*Id.* 160-61.) At trial, however, J.Z.
26   explained that the prosecutor told her she would not be charged with perjury whether she
27   "came in and said that it happened or came and said that it didn't happen." (*Id.* at 268.)

28        Detective Swartwood confirmed J.Z. told her Zanini shouldn't be in jail for

6

something he didn't do and just because she got mad at him. (ECF No. 90-9 at 32.)
Swartwood said J.Z. also told them that she wanted to recant because she was "done
with it," and said she "just didn't want to do it anymore." (ECF No. 90-7 at 220.) Swartwood
said J.Z. told them Ronnie did not want her to testify and did not want Zanini to go to jail,
but that he did not threaten her. (*Id*.) Swartwood admitted she told J.Z. that "lying is
perjury" and perjury could put her in jail. (*Id*. at 221-22.)

Licensed clinical social worker John Sebastian Pacult testified for the State that he
counsels victims, and prepares risk assessments for perpetrators, of sexual abuse,
juvenile to adult. (ECF No. 42-1 at 240-41.) He interviewed no one and reviewed no legal
documents related to this case. (*Id*. at 242, 253.) He said he has no specialized training
in child recantation; only his experience with it in clinical practice. (*Id*.) Pacult testified
recantation may occur due to overt and covert messages from family members not to
disclose abuse because of its effects on the family, finances, relationships, and potential
consequences. (*Id*. at 245, 259.) He said children may recant or stay with an abuser to
maintain normalcy and stability. (*Id*. at 260.) He said victims are also often "directly
threatened to lie, or to recant, or to change their story in various different ways; they're
told specifically to do that," and "they can be shunned, kind of become the black sheep of
the family" and may perceive "indirect messages and pressure" not to report abuse. (*Id*.
at 246.) He said child victims "understand that if they say it didn't happen, there's a chance
that the case can be dropped, and it can go away," they won't "have to get up on a stand,
they don't have to explain what happened again," and "hopefully everything can go back
together" and they can pretend it didn't happen. (*Id*. at 247-48.)

**D.    J.Z. testified her recantation was a lie.**

At trial, J.Z. testified the truth is Zanini sexually abused her, and she falsely
recanted because she wanted her brother back in her life and her grandfather wanted to
see Zanini before her grandfather dies. (ECF No. 90-6 at 66-67, 149-51, 268, 271.) J.Z.
testified she is comfortable lying to people with authority, including police, defense
counsel, and counsel's investigator. (*Id*. at 151, 157, 186, 205.)

J.Z. testified Zanini sexually abused her from the time she was in "fourth grade" and "8 or 9" years old, until June of 2008, when she was 15 years old. (*Id.* at 61-62, 120, 123.) She detailed incidents where he engaged her in cunnilingus, digital penetration, fellatio, and sexual intercourse in his home, garage, and vehicle. (*Id.* at 61-62, 67-93, 97-121.) For Count 1, she said that in January of 2008, he engaged her in sexual intercourse on his bed during which she heard the doorknob to the bathroom move as if someone tried to open the door, but the door was locked. (*Id.*) She said the bathroom was accessed through the master bedroom or the hallway. (*Id.* at 92-93, 118-19, 130-31, 136-37, 205-06.) For Count 2, she said he engaged her in sexual intercourse in June of 2008 on a comforter on the floor by the door inside her bedroom, ejaculated on the floor, and wiped it up with her pink shirt. (*Id.*) She testified that the room had previously been a computer room and guest room. (*Id.* at 73-74, 79-80.) For Count 17, she testified Zanini engaged her in sexual intercourse in his Santa Fe vehicle on the side of the road when she was in the 7th or 8th grade. (*Id.* at 109-11.)

J.Z.'s paternal aunt, Theresa Taack, testified that, in her opinion, J.Z. was untruthful "most of the time." (ECF No. 90-9 at 225-26.) Taack said J.Z. admitted to her that she made a false accusation of rape to police, her allegation was motivated by her fear of pregnancy, and J.Z. subsequently admitted the sex was consensual. (*Id.* at 253-55.) Taack, however, also testified that when J.Z. was 13 years old, she discovered Zanini and J.Z. in his "bedroom with the door shut." (*Id.* at 220-23.) Taack said she "felt that that was a little inappropriate" and tried the door handle but was unable to get inside the bedroom. (*Id.*) Taack said she spoke with her mother (J.Z.'s paternal grandmother) about it and her mother, in turn, spoke with Zanini about it. (*Id.*) Taack testified that on a separate occasion, she discovered J.Z. and Zanini on the couch in the garage underneath a blanket and "[J.Z.] was almost on top of him." (*Id.*) Taack said she again told her mother, and later asked J.Z. "if anybody was ever touching her that she didn't want touching her or touching her in places that she shouldn't be touched," but J.Z. "didn't say that anything had happened." (*Id.* at 223-24, 234.) On cross-examination, Taack admitted that, during her

1    interview with police, she did not tell them she saw J.Z. and Zanini underneath a blanket

2    in the garage. (*Id.* at 230-33.) J.Z.'s friend, T.A., testified J.Z. told her that Zanini sexually

3    abuse her, but she was not sure what to believe because J.Z. "[had] lied to [her]" although

4    she did not think J.Z. was a "pathological liar." (ECF No. 90-7 at 133-34.)

5    **III.    GOVERNING STANDARDS**

6         The Antiterrorism and Effective Death Penalty Act (AEDPA) provides the legal

7    standards for consideration of the Petition:

8

9         (d) An application for a writ of habeas corpus on behalf of a person in
          custody pursuant to the judgment of a State court shall not be granted with
          respect to any claim that was adjudicated on the merits in State court

10        proceedings unless the adjudication of the claim—

11            (1) resulted in a decision that was contrary to, or involved an
              unreasonable application of, clearly established Federal law,

12            as determined by the Supreme Court of the United States; or

13            (2) resulted in a decision that was based on an unreasonable
              determination of the facts in light of the evidence presented in

14            the State court proceeding.

15    28 U.S.C. § 2254(d). A state court's decision is contrary to clearly established Supreme

16    Court precedent, within the meaning of 28 U.S.C. § 2254(d)(1), "if the state court applies

17    a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if

18    the state court confronts a set of facts that are materially indistinguishable from a decision

19    of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court]

20    precedent." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529

21    U.S. 362, 405-06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state

22    court's decision is an unreasonable application of clearly established Supreme Court

23    precedent within the meaning of 28 U.S.C. § 2254(d)(1) "if the state court identifies the

24    correct governing legal principle from [the Supreme] Court's decisions but unreasonably

25    applies that principle to the facts of the prisoner's case." *Id.* (quoting *Williams*, 529 U.S.

26    at 413). "The 'unreasonable application' clause requires the state court decision to be

27    more than incorrect or erroneous . . . [rather] [t]he state court's application of clearly

28    established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409-

1    10, 412) (internal citation omitted).

2            The Supreme Court has instructed "a state court's determination that a claim lacks

3    merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the

4    correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011)

5    (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated

6    that "[e]ven a strong case for relief does not mean the state court's contrary conclusion

7    was unreasonable." *Id.* (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563

8    U.S. 170, 181 (2011) (describing the standard as a "difficult-to-meet" and "highly

9    deferential standard for evaluating state-court rulings, which demands state-court

10   decisions be given the benefit of the doubt.") (internal quotation marks and citations

11   omitted)). A state court is not required to cite Supreme Court cases or even be aware of

12   them, "so long as neither the reasoning nor the result of the state-court decision

13   contradicts them." *Early v. Packer*, 357 U.S. 3, 8 (2002). The petitioner carries the burden

14   of proof. *See Pinholster*, 563 U.S. at 181 (citing *Woodford v. Visciotti*, 537 U.S. 19, 24

15   (2002)). Where the state court has denied a federal constitutional claim on the merits

16   without explanation, this Court "determine[s] what arguments or theories supported or . .

17   . could have supported, the state court's decision" and then considers, "whether it is

18   possible fairminded jurists could disagree that those arguments or theories are

19   inconsistent with the holding in a prior decision of [the United States Supreme]

20   Court." *Richter*, 562 U.S. at 102.

21           Where there is no clearly established federal law, i.e., no holding from the Supreme

22   Court, stating a particular standard or rule at the time of the state court decision, then, by

23   definition, a petitioner cannot establish under AEDPA that the state court's decision was

24   either contrary to or an unreasonable application of clearly established federal law. *See,*

25   *e.g., Carey v. Musladin*, 549 U.S. 70, 76-77 (2006); *see also Williams,* 529 U.S. at 412

26   (interpreting "the meaning of the phrase 'clearly established Federal law, as determined

27   by the Supreme Court of the United States'" contained in 28 U.S.C. § 2254(d)(1) as

28   referring to "the holdings, as opposed to the *dicta*, of the [Supreme] Court's decisions as

1   of the time of the relevant state-court decision.") (emphasis in original). "[F]ederal habeas

2   relief does not lie for errors of state law . . ." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)

3   (internal citations omitted); *Estelle v. McGuire*, 502 U.S. 62, 67 (1991). Federal courts

4   defer to a state court's interpretation of state law and a petitioner may not "transform a

5   state-law issue into a federal one merely by asserting a violation of due process."

6   *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1997).

7   **IV.   DISCUSSION**

8   **A.   Ground 1—Evidence Regarding a Possible Plea or Negotiations**

9   Ground 1 alleges Zanini was denied due process, a fair trial, and the presumption

10  of innocence, guaranteed by the Fifth, Sixth, and Fourteenth Amendments, by the

11  introduction of (1) Zanini's statements about a possible plea during a jail call; and (2)

12  defense counsel's comments about negotiation to cancel the trial. (ECF No. 36 at 7-15.)

13  **1.   Additional Background**

14  **a.   Jail Call Number 7**

15  On December 2, 2008, the day before Zanini's preliminary hearing, Zanini made

16  the following statements to J.Z.'s brother, Ronnie, during a recorded call from the jail,

17  which was later played for the jury at trial as jail call number 7:

18
19   I am hoping to get everything straightened out, taken care of tomorrow, put it in the plea. You know, . . . whatever, something smaller, something without the word "life" in it, probation or whatever . . . Once we do that, and if we do that, then it'll only be one charge. Then, either [inaudible] hopefully we'll be able to get the judge to give me an OR, or an OR with house arrest, or, at the very least, you know mom will be able to bail me out . . . because it'll only be one charge, instead of 150,000 it'll be at most 20,000.

23  (ECF No. 49 at 3:20.) The next day, Zanini entered an unconditional waiver of his

24  preliminary hearing after negotiating an agreement to plead guilty to one count of

25  lewdness with a child under the age of 14 and a stipulated sentence of 10 years to life.

26  (ECF No. 38-5.) Zanini was scheduled to enter the guilty plea in January of 2009, but

27  never did so. (ECF No. 38-13 at 3.)

28  Zanini objected to admission at trial of all statements concerning plea negotiations

11

1    contained in jail calls as violative of NRS § 48.125.[10] (ECF No. 90-7 at 24-28.) The state

2    district court observed "the majority of the eight [jail calls] talk about possible plea deals.

3    There was a discussion about 25 to life, about 10 to life, about one charge, about what

4    was going to happen, and what anybody in the prison thought about that." (*Id.*) The court

5    ruled "the conversations that occurred between [Zanini] and his wife, and his nephew,

6    Ronnie, are not conversations that are in the course of negotiations" and do not come

7    within the letter of NRS § 48.125 or the caselaw. (*Id.*) The court ordered the State to

8    redact "portions that specifically relate to contemplated offers, or negotiations that were

9    going on at the time." (*Id.*)

10        Before questioning the District Attorney's investigator, Craig Fabert, the State

11   indicated "Court Exhibit 125" contained the "redacted" jail calls. (ECF No. 90-9 at 272-73,

12   288.) The State played "Exhibit 125" during Faber's testimony. (*Id.* at 295.) Defense

13   counsel moved for mistrial arguing the court's ruling required redaction of Zanini's

14   statement: "I'm hoping to get it taken care of tomorrow with the plea, hoping to get it to

15   the one charge and (indiscernible) house arrest. And some guy got house arrest pending

16   sentencing," and contended Zanini was prejudiced because "the jury now knows that he

17   was pleading guilty or he had already pled and he's talking about sentencing." (*Id.* at 296-

18   300.) The State argued it played "the redacted version." (*Id.* at 298.) Defense counsel

19   argued the State played the unredacted version because when counsel listened to it to

20   verify the redactions, counsel "didn't hear it" and counsel stated, "I don't know if the thing

21   skipped. I don't know if I fell asleep, I highly doubt it, but this was not in there." (*Id.* at 296-

22

23        [10]In Nevada, "[e]vidence of a plea of guilty or guilty but mentally ill, later
     withdrawn, or of an offer to plead guilty or guilty but mentally ill to the crime charged or
24   any other crime is not admissible in a criminal proceeding involving the person who made
     the plea or offer." NRS § 48.125(1); *see also Garner v. State*, 6 P.3d 1013, 1022 (Nev.
25   2000) ("To determine if a discussion should be characterized as a plea negotiation, [the
     Nevada Supreme Court] considers whether the accused had a subjective expectation of
26   negotiating a plea at the time of discussion and whether that expectation was
     reasonable.") (quoting *McKenna v. State*, 705 P.2d 614, 618 (Nev. 1985)); *see also Mann
27   v. State*, 605 P.2d 209, 211 (Nev. 1980) (holding "statements made pursuant to a plea
     agreement with the prosecutor and in the course of entering a guilty plea, subsequently
28   withdrawn," that included admissions of each of the elements of the charged offense,
     were inadmissible to impeach the defendant's testimony at a later trial on the same
     charges).

12

98, 302.) The State explained "the three redacted phone calls are on one CD. And then the two that I was going to play in their entirety are on separate CDs. I only have one of redacted calls." (*Id.*) The state district court noted, "nothing in these phone calls is directly plea negotiations" and "my ruling was not to talk about the plea negotiations or the fact that he was negotiating for a guilty plea." (*Id.* at 299.) The court further noted that defense counsel had agreed the recording was in accordance with the court's ruling. (*Id.* at 303.) The court explained it was not "clear . . . that it strictly violates the statute, which is what I've said all along. But I wanted to avoid undue prejudice . . . not have evidence about those discussions, because I think it can be unduly prejudicial with the jury because they don't understand all the reasons why that might occur . . ." (*Id.* at 304.) The state district court nonetheless concluded, "having made that ruling . . . [the statement is] not really about negotiations so much. It was what he wanted to get, and about when his anticipated sentencing date would be depending on if he was in or out of custody." (*Id.*) The court denied the motion for mistrial because it was "not clear" the statement in the call "so poisoned the jury that it could not be cured." (*Id.* at 305.) The court offered to "order it stricken and instruct [the jury] to disregard it" but Zanini declined a curative or limiting instruction. (*Id.* at 305, 307-08.)

### b.   Defense Counsel's Statement about Negotiations.

At trial, the prosecutor attempted to elicit J.Z.'s agreement that, during her recantation interview, defense counsel told her, "we'll try to do what we can to prevent the trial from going forward to work out a negotiation, but the truth of the matter is they're not going to simply dismiss the charges." (ECF No. 90-6 at 264-65.) Before J.Z. responded to that question, defense counsel moved for mistrial arguing the word "negotiation," implied Zanini's counsel was "looking for a deal," for him, which the jury might construe as contradicting his claims of innocence. (*Id.* at 265, 286-87.) The state district court denied the motion. (*Id.* at 266.) The court later ruled, "there weren't any statements made in the course of negotiations that were revealed" and offered to give an instruction striking the State's question. (*Id.* at 286-88.)

13

1    The next morning, Zanini renewed the motion for mistrial claiming the introduction

2    of defense counsel's remark, among other things, violated NRS § 48.125, implied Zanini

3    was looking for a deal even though he and his counsel maintain his innocence at trial,

4    and violated his Sixth Amendment right to counsel. (ECF No. 90-7 at 5-9.) The State

5    argued, among other things, that the introduction of defense counsel's statement was not

6    barred because there were no ongoing negotiations at the time counsel made the

7    statement. (*Id.* at 10-11, 15.) The state district court denied the motion for mistrial finding

8    the statement was not "in the scope of the statute because it wasn't in the course of the

9    negotiations, or regarding an offer that was made, or any plea entered." (*Id.* at 19.) The

10   court noted J.Z. did not answer the question and the question was not evidence as the

11   objection was sustained and the jury would be instructed "statements by counsel and

12   questions are not evidence; only testimony by witnesses are evidence." (*Id.* at 19-20.)

13   The court further stated, "the Supreme Court has made it pretty clear that they think

14   curative instructions do the job on issues like this" and ruled the statement was not "so

15   prejudicial that . . . a curative instruction couldn't remedy the situation, if any additional

16   instruction is needed." (*Id.*) Zanini maintained the only proper remedy was mistrial and

17   rejected a curative instruction because he "didn't want to bring any more attention to it."

18   (*Id.* at 18-19.)

19                    **2.    Applicable Legal Principles**

20           "The right to a fair trial is a fundamental liberty secured by the Fourteenth

21   Amendment." *Estelle v. Williams*, 425 U.S. 501, 503-04 (1976) ("The presumption of

22   innocence, although not articulated in the Constitution, is a basic component of a fair trial

23   under our system of criminal justice" and is considered "an element of Fourteenth

24   Amendment due process.")*; see also Taylor v. Kentucky*, 436 U.S. 478, 486 n.13 (1978).

25   "To implement the presumption, courts must be alert to factors that may undermine the

26   fairness of the fact-finding process" and "carefully guard against dilution of the principle

27   that guilt is to be established by probative evidence and beyond a reasonable

28   doubt." *Williams*, 425 U.S. at 503 (citing *In re Winship*, 397 U.S. 358, 364 (1970)).

1   Confessions or admissions made in the absence of plea negotiations, or which are wholly

2   independent from plea negotiations, may be admissible at trial. *See Hutto v. Ross*, 429

3   U.S. 28, 30 (1976) (holding not every statement made as a result of a plea bargain is *per*

4   *se* inadmissible and the defendant's confession made after a bargain was reached in that

5   case was admissible at trial, despite the defendant's later withdrawal of the plea, where

6   the trial court found the confession following the plea unnecessary and voluntary).

7          "The admission of evidence does not provide a basis for habeas relief unless it

8   rendered the trial fundamentally unfair in violation of due process." *Johnson v. Sublett*, 63

9   F.3d 926, 930 (9th Cir. 1995) (citing *McGuire*, 502 U.S. at 67-69). "The issue for [a federal

10  habeas court], always, is whether the state proceedings satisfied due process; the

11  presence or absence of a state law violation is largely beside the point." *Holley v.*

12  *Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (quoting *Jammal v. Van de Kamp*, 926

13  F.2d 918, 919-20 (9th Cir. 1991), citing *McGuire*, 502 U.S. at 67-68). Admission of

14  evidence violates federal due process "only if there are no permissible inferences the jury

15  may draw from it" and the evidence is "of such quality as necessarily prevents a fair trial."

16  *Jammal*, 926 F.2d at 920 (citation omitted); *see also Lisenba v. California*, 314 U.S. 219,

17  236 (1941).

18         Further, "[u]nder AEDPA, even clearly erroneous admissions of evidence that

19  render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief

20  if not forbidden by 'clearly established Federal law,' as laid out by the Supreme

21  Court." *Yarborough*, 568 F.3d at 1101 (citing 28 U.S.C. § 2254(d)); *see also Dowling v.*

22  *United States*, 493 U.S. 342, 352 (1990) (explaining that the Supreme Court has "defined

23  the category of infractions that violate 'fundamental fairness' very narrowly"). And

24  importantly, the Supreme Court "has not yet made a ruling that admission of irrelevant or

25  overtly prejudicial evidence constitutes a due process violation sufficient to warrant

26  issuance of the writ." *Id.*

27                    **3.    State Supreme Court's Determinations**

28         The Nevada Supreme Court concluded the statements did not constitute evidence

15

of plea negotiations prohibited by NRS § 48.125, and the verdict indicates the jury was

not unduly inflamed by the insubstantial and passing mention of a plea:

> Zanini argues that the district court abused its discretion in denying his motions for a mistrial on the grounds that the State violated a pretrial order and elicited evidence and testimony regarding pretrial plea negotiations. He asserts that the State referenced these negotiations during redirect examination of J.Z. and by failing to redact their mention in the recordings of jail calls played at trial.

> [FN 3] Zanini further asserts that the State improperly referenced plea negotiations during closing arguments, when it argued that Zanini attempted to manipulate J.Z. into either recanting, not showing up, or "say[ing] this is the punishment I want him to get." However, this passing reference to punishment was not "evidence of a plea of guilty or an offer to plead guilty" within the meaning of NRS 48.125(1).

> Zanini contends that he rejected the district court's offer of a curative instruction to avoid drawing further attention to the statements. Zanini argues that this court must find reversible error and remand this case for a new trial because the district court permitted multiple damaging references to aborted plea negotiations in violation of his rights to due process, a fair trial, and the presumption of innocence.

> "Denial of a motion for mistrial is within the district court's sound discretion, and this court will not overturn a denial absent a clear showing of abuse." *Randolph v. State*, 117 Nev. 970, 981, 36 P.3d 424, 431 (2001). During his trial, Zanini moved for a mistrial based on NRS 48.125(1), which states that evidence of a plea of guilty or an offer to plead guilty is not admissible in a criminal proceeding. To determine if a discussion should be characterized as a plea negotiation, this court considers whether the accused had a subjective expectation of negotiating a plea at the time of discussion and whether that expectation was reasonable. *McKenna v. State*, 101 Nev. 338, 344, 705 P.2d 614, 618 (1985), *abrogated on other grounds by Nunnery v. State*, 127 Nev.___, 263 P.3d 235 (2011).

> Here, two mentions of plea negotiations are at issue. The first occurred when the State was questioning J.Z. about what Zanini's attorney said to her when she discussed recanting. The State asked "[d]id [defense counsel] tell you that based upon what was going on . . . we'll try to do what we can to prevent the trial from going forward to work out a negotiation, but the truth of the matter is they're not going to simply dismiss the charges." The second mention of a plea occurred when the State played a recording of a jail call wherein Zanini stated that he was hoping to get everything straightened out and taken care of and put in a plea to something smaller, without the word "life" in it; if there was no charge or one charge, he hoped that the judge would release him on his own recognizance, on house arrest, or on bail.

> [FN 4] Zanini also claims that the State played a different CD in court than the one that his defense counsel listened to and approved. However, a review of the record reveals that there was only one CD. We additionally note that Zanini's defense counsel admitted that she may have fallen asleep while

16

1    listening to the CD; therefore, defense counsel would have
     partially [been] responsible for any ensuing error.
2
           The district court found that the mentions of pleas were not unduly
3    prejudicial. It found that the question that the State asked J.Z. did not violate
     NRS 48.125 by offering evidence of a plea negotiation because there were
4    no plea negotiations taking place at that time. The district court found that
     the jail call recordings were not about negotiations, but about what result
5    Zanini was hoping for and when he was getting out of custody. In both
     instances, the district court offered curative instructions, which Zanini
6    rejected.

7          We agree with the district court's findings that NRS 48.125 was not
     violated.
8
           [FN 5] We further note that any harm resulting from these
9          minor mentions of negotiation during J.Z.'s testimony and the
           jail calls was insubstantial; therefore, even if we had found that
10         the statements that Zanini complains of were evidence of plea
           negotiations, he has failed to show that those statements
11         were "so prejudicial as to be unsusceptible to neutralizing by
           an admonition to the jury." *See Allen v. State*, 99 Nev. 485,
12         490, 665 P.2d 238, 241 (1983).

13         The fact that the jury acquitted or hung on most of the counts
     evidences that it carefully considered each count and was not unduly
14   inflamed by the passing mention of a plea. We further note that there is no
     per se reversal rule when there is a passing mention of a plea negotiation.
15   Accordingly, we conclude that the district court did not abuse its discretion
     in denying Zanini's motions for mistrial.
16

17   (ECF No. 10-9 at 4-7.) Applying deferential review under AEDPA, the state supreme

18   court's determinations regarding the claims raised in Ground 1 are neither contrary to nor

19   constitute an unreasonable application of Federal law, as determined by the Supreme

20   Court, and are not based on unreasonable determinations of fact in the state court

21   record.[11]

22
     _____

23         [11]In his Petition, Zanini claims the state supreme court's determinations for
     Grounds 1, 3, 4, 5, 7, and 9, are "contrary to, or involved an unreasonable application of,
24   clearly established federal law, and/or involved an unreasonable determination of the
     facts adduced in the state court record" under 28 U.S.C. § 2254(d). (ECF No. 36 at 7, 15,
25   33, 36, 39, 68.) In his reply brief, however, Zanini claims this Court must conduct *de novo*
     review of those grounds because the state supreme court "overlooked" his federal
26   constitutional claims. (ECF No. 86 at 12-15, 21, 39-40, 48, 59, 87.) The Court declines to
     consider any new claim Zanini raised for the first time in the counseled reply brief.
27   *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007); *Cacoperdo v. Demosthenes*,
     37 F.3d 504, 507 (9th Cir. 1994). Moreover, a cursory review of the state court record
28   belies the assertion that Zanini can overcome the presumption that the state supreme
     court adjudicated the federal constitutional claims on the merits. The claims were fairly

1

### 4.      Disposition of Ground 1(A)—Jail Call Number 7

2      This Court defers to the state supreme court's determination that the admission of

3   Zanini's statements in jail call number 7 did not violate state law. The state supreme

4   court's factual determinations are objectively reasonable. The record supports the finding

5   that the State had only one compact disc containing redacted calls. Even assuming

6   Zanini's statement should have been redacted, it was reasonable to conclude it was

7   defense counsel's responsibility to ensure the recordings were properly redacted before

8   they were played to the jury. The state court record further supports the reasonableness

9   of the state supreme court's finding that Zanini's statements during the call were not part

10   of "ongoing plea negotiations" as the uncontradicted state court record shows plea

11   negotiations took place the following morning and Zanini's statements were aspirational

12   and did not reference conversations with the State. (ECF No. 38-5 at 3.)

13      The state supreme court reasonably rejected Zanini's federal due process claim.

14   A rational jury could reasonably infer Zanini conveyed that he hoped to do "whatever" was

15   necessary to reduce bail and his comments did not rule out trial over his innocence. A

16   jury might also reasonably infer consciousness of guilt from Zanini's aspirational

17   statements concerning a possible plea as the jury was instructed it could "draw

18   reasonable inferences from the evidence" which it felt were "justified in light of common

19   experience, keeping in mind that such inferences should not be based on speculation or

20

21   presented, the state supreme court's affirmance order acknowledged the claims, and
    Zanini never alleged in his petitions for rehearing and rehearing *en banc* that the state
22   supreme court overlooked his federal constitutional claims. *See Johnson v. Williams*, 568
    U.S. 289, 298 (2013) (citing *Richter*, 562 U.S. 99). Accordingly, review is deferential under
23   AEDPA.

24      There is also no merit to Zanini's claim in his reply brief that he is entitled to *de
    novo* review of Ground 1 because the state supreme reached contradictory conclusions
25   that NRS § 48.125 was not violated and the testimony concerning "plea" negotiations was
    harmless. (ECF No. 86 at 14, n.2.) There is nothing contradictory about the state court's
26   finding that NRS § 48.125 was not violated and the court's statement that there is "no per
    se reversal rule when there is a passing mention of a plea negotiation" as the state court
27   concluded, "even if we had found that the statements that Zanini complains of were
    evidence of plea negotiations, he has failed to show that those statements were 'so
28   prejudicial as to be unsusceptible to neutralizing by an admonition to the jury.'"(ECF No.
    10-9 at 7 n.5.)

1    guess." (ECF No. 88-1 at 23.) Zanini's contention that individuals consider pleading guilty

2    for "myriad reasons" does not render either of those inferences or the state supreme

3    court's determination unreasonable. (ECF No. 86 at 17.) The record also supports the

4    reasonableness of the conclusion that Zanini's statements were not "of such quality as

5    necessarily prevents a fair trial" because, as the state supreme court reasonably

6    concluded, the jury's failure to deliver a verdict for 12 of the 17 counts, shows the jury

7    was not prejudicially inflamed by Zanini's mention that he was hoping for a plea or

8    "whatever" would reduce his bail to an amount that would allow him to be released.

9    Finally, because Zanini has not demonstrated unfairness and the Supreme Court has not

10   held that "irrelevant or overtly prejudicial evidence constitutes a due process

11   violation," *Yarborough*, 568 F.3d at 1101, Zanini has failed to show that there was no

12   reasonable basis for the Nevada Supreme Court to deny relief.[12] *See Harrington*, 562

13   U.S. at 98. For these reasons, Zanini is not entitled to relief for Ground 1(A).

### 5.    Disposition of Ground 1(B)—Counsel's Statement

15       The state supreme court reasonably concluded this claim lacks merit. As the state

16   district court noted at trial, defense counsel's statement was not in evidence. And as

17   promised, the state district court instructed the jury that it must decide the case based on

18   the evidence, and that "statements, arguments and opinions of counsel are not evidence

---

[12]Zanini claims the state supreme court's determination is contrary to *Kercheval v. U.S.*, 274 U.S. 220 (1927). (ECF No. 86 at 8.) *Kercheval* is materially distinguishable. There the prosecutor introduced at trial a certified copy of Kercheval's plea agreement and in ruling that was impermissible, the Supreme Court distinguished statements of guilt in the guilty plea agreement from "mere admissions or extrajudicial confessions." *Kercheval*, 274 U.S. at 222-23. Zanini's jail call did not constitute the equivalent of a certified copy of a plea agreement.

In his reply brief, Zanini relies on *U.S.A. v. Ramos,* 2014 U.S. Dist. LEXIS 135870, *3 (C.D. Cal. 2014). (ECF No. 86 at 17-18.) In *Ramos*, a federal district court excluded emails the defendant sent to his wife, which the government sought to introduced for the purpose of proving Ramos was contemplating a guilty plea and therefore offered proof of consciousness of guilt under Fed. R. Evid. 401 and 403. The court found it unclear whether Ramos was discussing the possibility of pleading guilty and even if he was, the probative value of the emails was minimal because defendants consider pleading guilty for myriad reasons. *Id.* at 2-3. However, *Ramos* does not control here as it does not constitute clearly established Federal law, as determined by the Supreme Court, and the Court in *Ramos* exercised its discretion to exclude the emails under the Federal Rules of Evidence, not because admitting the emails would violate federal due process.

19

1    in the case." (ECF No. 88-1 at 19.) The state district court further instructed the jury that

2    it "must not speculate to be true any insinuations suggested by a question asked a

3    witness" and that "[a] question is not evidence and may be considered only as it supplies

4    meaning to the answer." (*Id.*) It is moreover reasonable to conclude that, under the

5    circumstances, the prosecutor's question, which included counsel's statement, was not

6    so prejudicial as to be unsusceptible to neutralizing by the admonitions given to the jury,

7    and the jury was not unduly inflamed by defense counsel's mention of "negotiation" in

8    connection with canceling the trial following the recantation. Zanini is not entitled to

9    federal habeas relief for Ground 1(B).

10          **B.      Ground 3—Admission of Hearsay and Uncharged Conduct**

11          Ground 3 alleges Zanini was denied due process and a fair trial as guaranteed by

12    the Fifth, Sixth, and Fourteenth Amendments, because the state district court permitted

13    witnesses J.Z., M.G., T.A., and Detective Swartwood, to testify to hearsay and uncharged

14    criminal conduct. (ECF No. 36 at 21-33.) The Nevada Supreme Court determined these

15    claims are without merit: "Zanini additionally argues that the district court erred in . . .

16    making improper evidentiary rulings regarding hearsay, incomplete and misleading

17    testimony, and inflammatory and prejudicial testimony . . . We have carefully considered

18    each of Zanini's remaining arguments, and we conclude that they are without merit." (ECF

19    No. 10-9 at 8 n.6.) For the reasons discussed below, the state supreme court's decision

20    is neither contrary to nor constitutes an unreasonable application of Federal law, as

21    determined by the Supreme Court, and is not based on an unreasonable determination

22    of the facts in the state court record.

23          **1.      Ground 3(A)—J.Z.'s Testimony About Her Statements to**
24          **Friends**

25          Ground 3(A) alleges the state district court violated Zanini's rights to due process

26    and a fair trial by permitting J.Z. to testify that, before her allegations against Zanini, she

27    told friends T.A. and M.G. that Zanini sexually abused her. (ECF No. 36 at 21-22.)

28    ///

1

### a.    Additional Background

2        Before opening remarks, the prosecutor stated, without defense objection, "I'm

3  assuming that we're all going to agree that the recant's coming into the trial," and asked

4  to call the State's recantation expert, Pacult, out of order noting, "it would be silly . . . not

5  to bring [the recantation] out on direct." (ECF No. 41-1 at 318.) During opening remarks,

6  the State argued the evidence would show J.Z. had, before reporting her allegations to

7  Detective Swartwood, disclosed Zanini's abuse to her girlfriend in 2006 and to a boyfriend

8  in 2008. (ECF No. 42-1 at 223-27.) Zanini objected that it was improper to mention J.Z.

9  told her friends about the abuse because Zanini planned to object to those statements as

10  hearsay. (*Id.*) The state district court consulted Nevada's hearsay rule, NRS §

11  51.035(2)(b),[13] and overruled the objections subject to later consideration whether the

12  statements would be admitted into evidence. (*Id.*)

13        In opening remarks, defense counsel argued the evidence would show J.Z. "has

14  told so many different stories with relation to what her allegations against [Zanini] are, her

15  allegations against the various people in the family, that there's no way to preview it for

16  you. We won't know until she takes the stand." (*Id.* at 229.) Counsel argued the evidence

17  would show J.Z. was "questioned by authorities on and off throughout" the time frame

18  when J.Z. claimed Zanini was abusing her because they questioned her about sexual

19  assault by other men, yet J.Z. did not reveal any abuse by Zanini. (*Id.* at 231-32.) Counsel

20  argued the evidence would show J.Z. recanted her allegations against Zanini and

21

22        [13]"Hearsay" means a statement offered in evidence to prove the truth of the matter
23  asserted unless:

            1. The statement is one made by a witness while testifying at the trial
24  or hearing;

            2. The declarant testifies at the trial or hearing and is subject to cross-
25  examination concerning the statement, and the statement is:
26
            (a) Inconsistent with the declarant's testimony;
27
            (b) Consistent with the declarant's testimony and offered to
28               rebut an express or implied charge against the declarant
                 of recent fabrication or improper influence or motive . . .

1   detectives pressured her to say someone influenced her to recant. (*Id.* at 232-38.) Finally,

2   counsel argued the State would present a social worker, but that the social worker would

3   not corroborate J.Z's allegations. (*Id.* at 238-39.) The State called the recantation expert,

4   Pacult, out of order as its first witness, and Zanini objected that Pacult's testimony was

5   not yet relevant and timely. (*Id.* at 239-40.) The State argued defense counsel's opening

6   remarks made Pacult's testimony relevant. (*Id.*) The objection was overruled. (*Id.*)

7          The next day, J.Z. testified on direct examination that she recanted the allegations

8   during an interview with defense counsel, and that her recantation was a lie. (ECF No.

9   90-6 at 65-66.) The defense did not object to J.Z.'s testimony that when she was in the

10  eighth grade, she told her friend, T.A., about Zanini's sexual abuse, and when she was in

11  the ninth grade, she told her then boyfriend, M.G., about it. (*Id.* at 122-24.) The defense

12  did not object to J.Z.'s testimony that T.A. did not try to get J.Z. to report the abuse. (*Id.*)

13  When J.Z. was asked whether M.G. tried to get her to tell anybody, she testified, again

14  without objection, that M.G. said he wished she would, but J.Z. testified M.G. "never asked

15  [her] or told [her] to." (*Id.*)

16         During cross-examination, defense counsel elicited J.Z.'s testimony that she told

17  defense counsel she told T.A. about the abuse. (*Id.* at 185.) Defense counsel further

18  elicited J.Z.'s admission that she lied when she told defense counsel that she had never

19  told M.G. about the abuse. (*Id.*) On redirect examination, J.Z. testified without objection

20  that she informed Swartwood she had told T.A. about the abuse a year or two before her

21  interview with Swartwood. (*Id.* at 248.)

22                         **b.      Disposition of Ground 3(A)**

23         The Court defers to the state supreme court's determination that J.Z.'s testimony

24  about her prior statements to her friends did not violate state law. The state supreme

25  court's rejection of Zanini's federal due process claim as lacking in merit is objectively

26  reasonable. The jury could draw reasonable inferences about J.Z.'s credibility based on

27  the timing and substance of her disclosures of abuse to her friends. The disclosures to

28  J.Z.'s friends predated the allegations J.Z. made to Swartwood, J.Z.'s subsequent

22

1    recantation to defense counsel, and J.Z.'s post-recantation interview with the detectives.

2    Under the circumstances of this case, it is reasonable to conclude J.Z.'s testimony that

3    she told her friends that Zanini sexually abused her was not "of such quality as necessarily

4    prevents a fair trial." Accordingly, because Zanini has not demonstrated unfairness and

5    because the Supreme Court has not held that "irrelevant or overtly prejudicial evidence

6    constitutes a due process violation," *Yarborough*, 568 F.3d at 1101, Zanini has failed to

7    show that there was no reasonable basis for the Nevada Supreme Court to deny

8    relief.[14] *See Harrington*, 562 U.S. at 98. Therefore, Zanini is not entitled to federal habeas

9    relief for Ground 3(A).

10                **2.      Ground 3(B)—J.Z.'s Testimony about Statements to Swartwood**

11           Ground 3(B) asserts Zanini's rights to due process and a fair trial were violated

12   when J.Z. testified to statements she made to Swartwood. (ECF No. 36 at 22-27.)

13                       **a.      Additional Background**

14           During J.Z.'s redirect examination, the State moved to admit all three of J.Z.'s

15   interviews, including (1) her initial interview with Swartwood; (2) her recantation to

16   defense counsel; and (3) her post-recantation interview with Detectives Swartwood and

17   Abernathy. (ECF No. 90-6 at 213-17.) Defense counsel objected that the recorded

18   interviews were irrelevant and hearsay, contending: "She testified that she recanted. She

19   testified that she recanted another time. There's absolutely no reason to put in the entire

20   transcript." (*Id.*) The State argued some of J.Z.'s statements in the interviews were

21   admissible as nonhearsay prior consistent statements and others were admissible under

22   the hearsay exception for prior inconsistent statements. (*Id.*) Defense counsel countered:

23   "She admitted everything in all of them, and therefore there is no legal avenue. It's

24   hearsay." (*Id.*) The state district court noted, "It's not hearsay . . . if the witness is subject

25

26           [14]In *United States v. Tome*, the Supreme Court held that, under the Federal Rules
27   of Evidence, prior consistent statements of a child in a sexual assault case were
     admissible to rebut a charge of recent fabrication or improper influence or motive only if
     the prior consistent statements were made before the charged recent fabrication or
28   improper influence or motive. 513 U.S. 150, 167 (1995). *Tome* did not create a
     constitutional limitation on the admission of prior consistent statements. *See id.*

1    to cross-examination concerning the statement and it's inconsistent with his testimony, or

2    if it's consistent being offered to rebut an express or implied charge of improper influence

3    or motive." (*Id.*) The State argued the statements in the transcripts were admissible to

4    rebut the defense argument that J.Z.'s testimony recanting the recantation is the product

5    of improper influence by the State. (*Id.* at 215-23.) The state district court declined to

6    admit the interview transcripts and permitted J.Z. to testify about her statements to

7    Swartwood to the extent they were "inconsistent," or "consistent" with J.Z.'s testimony on

8    direct examination. (ECF No. 90-6 at 215-31, 235-36, 240-45, 257-58.)

9         During J.Z.'s redirect examination, the state district court asked J.Z whether she

10   told Swartwood "about the incidents" that J.Z. recounted at trial and J.Z. replied, "I think

11   so, yes. A couple of them." (*Id.* at 252-53.) The state district court next asked J.Z. whether

12   she could "remember which ones" she told to Swartwood and testified to at trial, and J.Z.

13   responded, "I told [Swartwood] about the incident with the car, with the Santa Fe. You

14   guys heard the Vampires one. There were—I've told [Swartwood] about the Smallville,

15   when we used to watch Smallville," but J.Z. said she did not recall any others. (*Id.*) The

16   court directed the State that it could "go through the ones" that J.Z. told to Swartwood and

17   that she testified about at trial. (*Id.*)

18              **b.    Disposition of Ground 3(B)**

19        The Court defers to the state supreme court's conclusion that J.Z.'s testimony

20   about her prior statements to Detective Swartwood did not violate state law. The state

21   supreme court's rejection of the federal due process claim was objectively reasonable. A

22   jury could draw reasonable inferences about J.Z.'s credibility based on the consistencies

23   and inconsistencies between her allegations of sexual assault at trial and those she made

24   to Swartwood, particularly because there was evidence from which the jury could infer

25   J.Z. may have been influenced by family to recant and by the State to recant the

26   recantation. It is moreover reasonable to conclude that J.Z.'s testimony was not of such

27   a quality as to prevent a fair trial in this context because the defense thoroughly cross-

28   examined J.Z. and Swartwood about the consistencies and inconsistencies between

24

1  J.Z.'s testimony and her statement to Swartwood and argued to the jury that the

2  inconsistencies undermined J.Z.'s credibility. Because Zanini has not demonstrated

3  unfairness and the Supreme Court has not held that "irrelevant or overtly prejudicial

4  evidence constitutes a due process violation," *Yarborough*, 568 F.3d at 1101, Zanini has

5  failed to show that there was no reasonable basis for the Nevada Supreme Court to deny

6  relief. *See Harrington*, 562 U.S. at 98. Accordingly, Zanini is not entitled to federal habeas

7  corpus relief for Ground 3(B).

8  ### 3.  Ground 3(C)—M.G. and T.A.'s Testimony

9  Ground 3(C) alleges the state district court violated Zanini's rights to due process

10  and a fair trial by permitting T.A. and M.G. to testify that J.Z. told them Zanini sexually

11  abused her, the abuse occurred in the shower, and J.Z. did not wish to report the abuse

12  and asked them not to do so. (ECF No. 36 at 27-31.)

13  ### a.  Additional Background

14  M.G. testified he dated J.Z. while they were in the ninth grade from February 2,

15  2008, until the end of March 2008. (ECF No. 90-7 at 87-91.) He testified, without objection,

16  that during that time, J.Z. told him Zanini had been "doing sexual things to her" and "she

17  wasn't doing anything about it." (*Id.* at 92-93.) He said he asked her "why" and she replied

18  that "she didn't know." (*Id.*) Without objection, M.G. testified he "asked if she would mind"

19  if he "were to do something about it," and she asked him "not to" do so. (*Id.*) When the

20  State asked M.G. whether he was sure she told him between February and March of

21  2008, defense counsel objected that M.G.'s testimony was hearsay and apologized for

22  not making a contemporaneous objection. (*Id.* at 93-94.) The state district court overruled

23  the objection because the testimony constituted "prior consistent statements under the

24  exception . . ." (*Id.*) On cross-examination, defense counsel twice elicited M.G.'s

25  testimony that J.Z. told him the abuse occurred in the shower. (*Id.* at 94, 99-100.) On

26  redirect, M.G. said J.Z. told him Zanini would "take her into the shower and sexually abuse

27  her" but "she wasn't specific about it." (*Id.* at 102.)

28  After M.G. testified, T.A. testified that in 2006, J.Z. told her Zanini "raped her and

1  molested her" and "would just take her into a different room or call her into a room and

2  lock the door, and rape her there." (*Id.* at 103-04, 109-16, 126.) T.A. also said J.Z. "told

3  [her] that [Zanini] would call her into a room and ask her to brush his hair, and that would

4  be like a cover for it." (*Id.*) She also said J.Z. told her Zanini "would walk in while she was

5  in the shower, and just like grab her and rape her." (*Id.*) She further testified without

6  objection, that J.Z. told her she never told anybody about it and didn't know what to do.

7  (*Id.* at 117.) T.A. said she told J.Z. "you need to tell someone," and J.Z. replied, "I can't, I

8  can't." (*Id.*) T.A. said she never told anyone because J.Z. asked her not to do so. (*Id.*)

9  The State asked T.A. whether she was aware of pressure from the family or how

10  the family has been since J.Z. reported the abuse, and the defense objected that the

11  testimony was irrelevant, hearsay, and prejudicial. (*Id.* at 117-19.) The State argued it is

12  not hearsay because it was offered to show the effect on J.Z.'s thoughts and feelings, in

13  light of the recantation and the defense's cross-examination in which J.Z. admitted she

14  was comfortable lying. (*Id.*) The state district court ruled T.A.'s testimony was relevant

15  and admissible for nonhearsay purposes provided the State laid a foundation for T.A.'s

16  knowledge and offered to instruct the jury that the testimony is not admitted for the truth

17  of the matter contained therein, but only for the effect on J.Z. (*Id.* at 120.)

18  At that point, the defense moved for a mistrial and to strike M.G. and T.A.'s

19  testimony about what J.Z. told them on the grounds that it constituted hearsay. (*Id.* at

20  120-21.) Zanini argued their testimony was not admissible under the nonhearsay

21  exception for prior "consistent" statements offered to refute recent fabrication or improper

22  influence to recant because J.Z. never testified, as did M.G. and T.A., that Zanini abused

23  her in the shower or during hair-brushing. (*Id.*) The State argued J.Z.'s statements to her

24  friends about abuse involving the shower and hair brushing were prior inconsistent

25  statements offered to rebut the recantation. (*Id.*) The state district court denied the motion

26  for mistrial and overruled the objection noting, "The point was that she reported that there

27  was sexual contact with the defendant . . . before there was the issue about the boot

28  camp threat; or other threats that have been made." (*Id.*) The court stated it would inform

1    the jury "not to take it for the truth of the matter" when the statements "come out." (*Id.*)

2    T.A. testified she had ongoing contact with J.Z. after J.Z. made her allegations

3    against Zanini, and that J.Z. would call T.A. and "be very upset that someone was mad

4    at her because of what was going on" and that J.Z. "was scared she was going to lose

5    her family . . . because they didn't believe her . . ." (*Id.* at 122-23.) The state district court

6    immediately instructed the jury, "She's now repeating things that [J.Z.] had told her. It's

7    coming into evidence only for the purpose of showing the effect that it had on [J.Z.], and

8    what her mental state was." (*Id.*) The state district court instructed, "Those statements

9    that she is repeating are not coming in for the truth of the matters that were stated in those

10   statements" and "so please only take them for whatever effect they had on Mr. Zanini [sic]

11   at the time." (*Id.*) T.A. further testified J.Z. told her Margie had completely disowned her

12   and stopped talking to her, and Ronnie wouldn't talk to her for a while. (*Id.* at 123-24.)

13   T.A. also testified J.Z. "said that everybody was mad at her and that she just wanted to

14   give up and let it go, because she was scared that she would lose everything." (*Id.*) The

15   State elicited T.A.'s testimony that she told police the same thing she stated in her

16   testimony and the state district court sustained the defense objection and directed the

17   jury to disregard the question and answer. (*Id.* at 124-25.) On cross-examination, T.A.

18   admitted everything she knew was based on what J.Z. told her. (*Id.* at 134-36.)

19   In closing remarks, defense counsel argued J.Z. contradicted T.A.'s testimony that

20   brushing Zanini's hair was an excuse to call J.Z. into a room so he could sexually abuse

21   her, and that J.Z. never made such statements to Swartwood. (ECF No. 90-10 at 42, 47-

22   48.) Counsel argued the story that J.Z. told M.G. and T.A. about rape in the shower lacked

23   credibility because J.Z. did not testify or tell Swartwood about abuse in the shower. (*Id.*

24   at 43, 47–48.) In rebuttal, the State argued J.Z.'s disclosures to M.G. and T.A. enhanced

25   her credibility because they occurred long before J.Z.'s allegations to police. (*Id.* at 63-

26   64.)

27              **b.    Disposition of Ground 3(C)**

28   The Court defers to the state supreme court's determination that the testimony of

1   T.A. and M.G. did not violate state law. The state supreme court also reasonably rejected

2   the federal due process claim. It is reasonable to conclude the jury could draw multiple

3   inferences about J.Z.'s credibility based on the timing and substance of J.Z.'s statements

4   to M.G. and T.A., and under the circumstances of this case, their testimony was not of

5   such a quality as to render the trial unfair. Moreover, J.Z. testified about an assault while

6   she was entering the shower and it was the defense, not the prosecution, who

7   commenced the questioning of M.G. and T.A. about J.Z.'s statements to them concerning

8   alleged abuse in the shower. The jury was entitled to draw from that testimony reasonable

9   inferences about J.Z.'s credibility, because although J.Z. testified Zanini assaulted her in

10  the bathroom before her entering the shower, she mentioned no such incident or any

11  abuse in the shower to Swartwood.

12          The jury could moreover draw reasonable inferences about J.Z.'s credibility from

13  T.A.'s testimony that J.Z. told her that brushing Zanini's hair was an excuse to get her in

14  a room so he could sexually abuse her, because J.Z. denied brushing Zanini's hair was

15  a precursor to sexual abuse and Swartwood testified that J.Z. did not tell her anything

16  about hair brushing. The jury could draw reasonable inferences about J.Z.'s credibility

17  based on the testimony that J.Z. told them she did not wish to report the abuse, as well

18  as T.A.'s testimony that J.Z. told her about her family's negative reaction toward J.Z. after

19  she made the allegations. Given Pacult's testimony, and that the recantation and recant

20  of the recantation was part of the calculus in assessing J.Z.'s credibility at trial, such

21  testimony was not of such a quality as to render the trial unfair. Because Zanini has not

22  demonstrated unfairness and the Supreme Court has not held that "irrelevant or overtly

23  prejudicial evidence constitutes a due process violation," *Yarborough*, 568 F.3d at 1101,

24  Zanini has failed to show that there was no reasonable basis for the Nevada Supreme

25  Court to deny relief. *See Harrington*, 562 U.S. at 98. Zanini is therefore not entitled to

26  federal habeas relief for Ground 3(C).

27          **4.      Ground 3(D)—Swartwood's Testimony about J.Z.'s Statement**

28          Ground 3(D) alleges the state district court violated Zanini's rights to due process

28

1    and a fair trial when it permitted Detective Swartwood to testify to J.Z.'s statements

2    concerning the abuse during their initial interview. (ECF No. 36 at 31-32.)

3                    **a.    Additional Background**

4             During Swartwood's direct examination, Zanini objected to Swartwood

5    summarizing J.Z.'s description of 11 incidents of sexual assault. (ECF No. 90-7 at 195-

6    97.) The State argued the testimony was admissible in part as either prior consistent

7    statements corroborating J.Z.'s testimony and refuting the improper influence, or in part

8    as prior inconsistent statements for purposes of impeaching J.Z.'s recantation. (*Id.* at 197-

9    98.) Zanini objected that such testimony was cumulative and improperly bolstered J.Z.'s

10   testimony. (*Id.* at 198-99.) Initially, the state district court ruled the State "can go through

11   generally with this witness the prior consistent statements" but not the inconsistent

12   statements and clarified "what the statute requires on the inconsistent testimony is that

13   the declarant testifies at the trial, and is subject to cross-examination concerning the

14   statement. She was subject to cross-examination, so I guess she could've been cross-

15   examined about what she previously said that she didn't say [at trial]." (*Id.* at 200-02.)

16   Later, however, the State stated it would not pursue charges for any incident of sexual

17   assault that J.Z. told to Swartwood unless J.Z. testified about the incident a trial. (*Id.* at

18   204-05.) The state district court thereafter permitted the State to elicit Swartwood's

19   testimony about statements J.Z. made to her that were inconsistent with J.Z.'s testimony

20   at trial. (*Id.*) On cross-examination, the defense elicited Swartwood's testimony that J.Z.

21   did not tell her about incidents of abuse that J.Z. and others testified about at trial,

22   including incidents (1) in the shower; (2) involving a request to brush Zanini's hair as a

23   starting point for sexual abuse; (3) in the garage; (4) on a dog bed in the master bedroom

24   while her aunt slept on the bed; and (5) when J.Z.'s grandmother walked into the room

25   after abuse. (ECF Nos. 90-7 at 194-96, 205-09, 90-9 at 9-11.) *See supra* at p. 4-5.

26                   **b.    Disposition of Ground 3(D)**

27            The Court defers to the state supreme court's conclusion that Swartwood's

28   testimony did not violate state law. The state supreme court's rejection of the federal due

1   process claim as lacking merit is objectively reasonable. The jury was entitled to draw

2   reasonable inferences about J.Z.'s credibility based on the differences between her

3   allegations of abuse at trial and the prior allegations she made to Swartwood. J.Z.'s

4   credibility was the focal point of the trial, defense counsel elicited numerous instances

5   where J.Z.'s prior statements to Swartwood were inconsistent with J.Z.'s trial testimony,

6   the State vowed not to prosecute Zanini for any acts to which J.Z. did not testify at trial,

7   and the jury hung on 12 of the 17 counts. On this record, it is reasonable to conclude

8   Swartwood's testimony was not of such a quality as to prevent a fair trial. Accordingly,

9   because Zanini has not demonstrated unfairness and the Supreme Court has not held

10  that "irrelevant  or  overtly  prejudicial  evidence  constitutes  a  due  process

11  violation," *Yarborough*, 568 F.3d at 1101, Zanini has failed to show that there was no

12  reasonable basis for the Nevada Supreme Court to deny relief. *See Harrington*, 562 U.S.

13  at 98. Zanini is therefore not entitled to federal habeas corpus relief for Ground 3(D).[15]

14       **C.**    **Ground 4—Prosecutorial Misconduct**

15       Ground 4 alleges Zanini's rights to due process and a fair trial under the Fifth,

16  Sixth, and Fourteenth Amendments, were violated because the prosecutor and Detective

17  Swartwood improperly vouched for, or bolstered, J.Z.'s credibility. (ECF No. 36 at 33-36.)

18       **1.**    **Applicable Legal Principles**

19       A prosecutor's "vouching for the credibility of witnesses" can "convey the

20  impression that evidence not presented to the jury, but known to the prosecutor, supports

21  the charges against the defendant and can thus jeopardize the defendant's right to be

22  tried solely on the basis of the evidence presented to the jury." *United States v. Young*,

23  470 U.S. 1, 18 (1985). To warrant habeas relief, acts of prosecutorial misconduct must

24

25            [15]Zanini's claim that the state supreme court's determinations for the claims raised
26  in Ground 3 are contrary to *Chambers*, 410 U.S. 284, is without merit. (ECF No. 86 at 21,
    37.) In *Chambers*, the defendant was not permitted to cross-examine an individual who
27  had repeatedly confessed to the crime or call witnesses to refute the repudiation of the
    confessions. *See infra* at p. n41. Here, the state court record shows Zanini was not
28  prevented from cross-examining all of the witnesses, including cross-examining J.Z.
    about discrepancies between her trial testimony and her statements to Swartwood, and
    to call witnesses for the purpose of introducing evidence bearing on J.Z.'s credibility.

1  have "so infected the trial with unfairness as to make the resulting conviction a denial of

2  due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v.*

3  *DeChristoforo*, 416 U.S. 637 (1974)). The standard is general, leaving courts "leeway in

4  reaching outcomes in case-by-case determinations . . ." *Parker v. Matthews*, 567 U.S. 37,

5  48 (2012) (quoting *Alvarado*, 541 U.S. at 664).

6          To determine whether, for instance, a prosecutor's comments rise to the level of a

7  due process violation, courts examine the prosecutor's remarks in context based on the

8  entire proceedings. *See Boyde v. California*, 494 U.S. 370, 385 (1990) (citations

9  omitted); *see also Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("The touchstone of due

10  process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial,

11  not the culpability of the prosecutor."). Factors to consider when determining whether a

12  prosecutor's comment "rendered a trial constitutionally unfair," include: (1) whether the

13  comment misstated or manipulated the evidence; (2) whether the judge admonished the

14  jury to disregard the comment; (3) whether defense counsel invited the comment; (4)

15  whether defense counsel had an adequate opportunity to rebut the comment; (5) the

16  prominence of the comment in the context of the entire trial; and (6) the weight of the

17  evidence. *Hein v. Sullivan*, 601 F.3d 897, 912-13 (9th Cir. 2010) (citing *Darden*, 477 U.S.

18  at 182). For purposes of determining whether the prosecution engaged in misconduct in

19  the form of vouching for a witness, the Ninth Circuit has stated a court considers the

20  following factors: (1) the form of vouching; (2) how much the vouching implies the

21  prosecutor has extra-record knowledge of or the capacity to monitor the witness's

22  truthfulness; (3) any inference the court is monitoring the witness's veracity; (4) the

23  degree of personal opinion asserted; (5) the timing of the vouching; (6) the extent to which

24  the witness's credibility was attacked; (7) the specificity and timing of a curative

25  instruction; and (8) the importance of the witness's testimony and the vouching to the

26  case overall. *United States v. Necoechea*, 986 F.2d 1273, 1278 (9th Cir. 1993), *as*

27  *amended on denial of reh'g* (Apr. 15, 1993).

28          For habeas relief, a state court's rejection of a prosecutorial misconduct claim must

1   be objectively unreasonable, i.e., "so lacking in justification that there was an error well

2   understood and comprehended in existing law beyond any possibility for fairminded

3   disagreement." *Parker,* 567 U.S. at 47 (quoting *Richter,* 562 U.S. at 103). If so, then

4   "prosecutorial misconduct warrant[s] relief only if [it] 'had substantial and injurious effect

5   or influence in determining the jury's verdict.'" *Brown v. Davenport*, 142 S. Ct. 1510, 1517

6   (2022) ("When a state court has ruled on the merits of a state prisoner's claim, a federal

7   court cannot grant relief without first applying both the test this Court outlined in [*Brecht*

8   *v. Abrahamson*, 507 U.S. 619 (1993)] and the one Congress prescribed in AEDPA.").

9                    **2.      Disposition of Ground 4(A)—Swartwood's Testimony[16]**

10          Zanini claims the State vouched for J.Z.'s credibility through the testimony of

11  Detective Swartwood about J.Z.'s initial allegations of abuse. (ECF No. 36 at 33-36.) In

12  his state court direct appeal, Zanini alleged "Swartwood's testimony constitutes improper

13  vouching and bolstering" in violation of his constitutional rights to due process and a fair

14  trial. (ECF No. 90-1 at 26-28.) The Nevada Supreme Court ruled these claims lacked

15  merit when it stated that it "carefully considered each of Zanini's remaining arguments,

16  and we conclude that they are without merit." (ECF No. 10-9 at 8 n.6.) The state supreme

17  court's determination is neither contrary to nor constitutes an unreasonable application of

18  Federal law, as determined by the Supreme Court, and is not based on an unreasonable

19  determination of the facts in the state court record.

20          Zanini claims the State vouched that it had special knowledge of extra-record

21  evidence supporting J.Z.'s credibility when Swartwood testified at trial that J.Z. told her

22  about 11 specific incidents that Swartwood "could detail in [her] report where she gave

23  me specific details, different places, different times, different ages, different types of

24  sexual acts" and then summarized the incidents. (ECF No. 36 at 33-34.) Zanini claims

25  Swartwood bolstered J.Z.'s credibility by testifying J.Z. told her the abuse occurred for a

26  long period of time, it was "difficult to get an exact number of incidents," and the abuse

27

28          [16]The Court subdivides Ground 4 for clarity.

occurred "about once a month" between the ages of 8 and 12 and "twice a month" between the ages of 12 and 15. (*Id.*) Zanini claims Swartwood vouched for J.Z. by testifying J.Z. told her incidents like the one in the kitchen "occurred a couple, two, three more times at least." (*Id.*) In context, Swartwood testified:

> Q    Who was it that told you why they were there?
>
> A    J.Z.
>
> Q    And what specifically did she say?
>
> A    When I began speaking with J.Z., I brought her into the interview room. We did the interview. She told me that she had been sexually abused by her uncle, [Zanini], since she was eight years-old.
>
> Q    Did she tell you how long the abuse had been going on?
>
> A    For—she said 15 years-old at the time that I interviewed her. So it was from the time that she was 8 years-old to 15 years-old. It had started out when she was 8, and then continued on.
>
> . . .
>
> Q    Did she give you specific instances of abuse?
>
> A    Yes . . . I asked her a few general questions about what had happened. And then I explained to her that the best way for me to get as much information I can is for her to remember as many specific incidents that she could remember that had occurred. Obviously, I knew she wouldn't remember every incident, but anything that she could give me specific details [sic] would help me investigate.
>
> Q    So did she describe multiple acts to the point where you wouldn't be able to separate them out?
>
> A    She described approximately 11 specific incidents that I could detail in my report where she gave me specific details, different places, different times, different ages, different types of sexual acts.
>
> Q    Did she describe for you generally the frequency with which acts were occurring?
>
> A    Yes. It's—when it's such a long-term, ongoing abuse, it's difficult to get an exact number of incidents. So I asked her to kind of give me a general idea of how often this happened. She said that approximately from the time she was 8 years-old until the time she was 12, it would happen about once a month. When—from the time she was 12 to 15, it would happen approximately twice a month.
>
> . . .

1    Q    Can you just briefly summarize the 11 incidents for me?

2    . . .

3    A    The initial incident that she could recall, she didn't say this was actually—she was 8 years-old. She remembered being asleep on the couch at—in the apartment, and [Zanini] picking her up, putting her onto a rug in the kitchen, and performing oral sex on her. And then picking her up and putting her back on the couch, telling her that he was sorry, and then going into the bathroom for a length of time, and she fell asleep.

7    Q    That's one?

8    A    Yes. The second incident that she detailed with me—I'd have to look at my report to make sure I get the correct incident.

10    Q    Would that refresh your recollection?

11    A    Yes, it would.

    (Pause in proceedings)

13        DEFENSE COUNSEL: Judge, may we approach just to see what she's looking at?

14        THE COURT: Yes.

15        THE WITNESS: It's the crime report. She had told me that—obviously this wasn't the second incident, this was the second incident that she could recall. The first incident—she said similar things like that had occurred a couple, two, three more times at least.

18    (ECF No. 90-7 at 190-91, 195-96.)

19        The state supreme court reasonably rejected the claim that Swartwood's testimony vouched or bolstered J.Z.'s credibility. Swartwood's testimony did not indicate J.Z.'s statements to her were true or that the State had evidence known to the State but not conveyed to the jury that proved J.Z.'s allegations were true. The testimony did not suggest the State had the capacity to confirm or monitor the truth of J.Z.'s allegations. It is moreover reasonable to conclude Swartwood's testimony did not so infect the trial with unfairness as to make the resulting conviction a denial of due process. Defense counsel had an adequate opportunity to rebut the testimony through cross-examination of J.Z., Swartwood, and others, about J.Z.'s conflicting stories concerning the charges at trial and expose that none of the witnesses had the ability to confirm J.Z.'s truthfulness and none

34

had extra-record evidence that did so. Moreover, defense counsel exploited the discrepancies in J.Z.'s testimony vis a vis the stories she told to Swartwood and argued J.Z. lacked credibility for purposes of proving the case beyond a reasonable doubt.

Zanini additionally claims Swartwood's statements constituted vouching because the prosecutor said Swartwood's testimony "makes it corroborative and arguably more credible to the jury if a detective who's testifying about the nature of J.Z. (indiscernible) what I told her. I mean this is before (indiscernible) these people went out and threatened to take her baby away, so." (ECF No. 90-7 at 30-31.) The state supreme court could reasonably conclude this claim lacks merit when read in context. The state district court permitted J.Z. to testify to incidents she relayed to Swartwood, but J.Z. recalled only three incidents she told to Swartwood that she also testified to at trial. Read in context, the prosecutor's remark suggested Swartwood's testimony was more credible than J.Z.'s testimony concerning the contents of J.Z.'s allegations to Swartwood. Thus, the prosecutor's comment neither conveyed Swartwood's testimony about J.Z.'s statements to her made J.Z.'s allegations of abuse truthful, nor suggested Swartwood or the State had extra-record evidence confirming the truth of any of J.Z.'s allegations, or the ability to monitor J.Z.'s truthfulness.

Zanini further claims Swartwood conveyed a personal belief in JZ's credibility and placed the prestige of law enforcement and the State in support of J.Z.'s credibility, when she testified (1) J.Z. "gave very good details, and what you would expect, having more details from more recent incidences, more details from a more significant incidence, like the first time that he had vaginal intercourse with her," and (2) if J.Z. told M.G. and T.A. about the abuse, it "lends credence . . . lends support." (ECF No. 36 at 35.) In context, Swartwood testified:

Q    At any time did you suggest any answers to questions for her?

A    No. When we do interviews with children, even though she's 15 years-old and she's not as suggestible as a five year-old, I interview 3 year-olds, I interview 4 year-olds. They're very suggestible to make—giving answers to people.

So what we do is it's always using an open-ended question.

35

1            "Tell me what happened. Okay, tell me more. Did anything else
2            happen?" You're very open-ended with them to try and get them to
           give you as much information without you asking any question of
3            them. And she cried several times during the interview.

4    Q     And was she giving you a lot of information?

   A     Yes. She gave very good details, and what you would expect, having
5            more details from more recent incidences, more details from a more
           significant incidence, like the first time that he had vaginal intercourse
6            with her.

7    . . .

8    Q     Did you ultimately interview any other people in this case?

9    A     Yes, I did.

10   Q     Who else did you interview?

11   A     I also interviewed her aunt, Theresa Taack.

12   Q     Okay. And these were all tape recorded interviews; is that right?

13   A     Yes, they were.

14   Q     Who else?

15   A     I also interviewed her grandmother, Theresa Zanini. I interviewed her
16            friend—

   Q     [M.G.]?
17

   A     [M.G.]—her ex-boyfriend [M.G.]. I did interview [M.G.]. I also
18            interviewed [T.A.], her friend.

19   Q     And basically, those interviews are investigative in an attempt to
20            corroborate or just corroborate?

   A     Yes. Yes. If they have information that could provide evidence in the
21            case, or could provide more information to support or deny the
           allegations, then we interview them to get more information from
22            them.

23   Q     And the reason that you interviewed [M.G.] and [T.A.]?

24   A     During her interview, one of the things we ask our victims, or the
           children in our cases is that if they've ever told anybody else. What
25            this tells us is that if they tell somebody else about it, this isn't
           something that they just spontaneously said, oh, this happened. If
26            they told someone else several months ago that this happened,
           okay, that lends credence, that lends support that they told
27            somebody else.

28                Then if they told also somebody else at a different time period,
           that lends support, because then they're not—this is something that

1
2
3

they've told several people. And that's—and she had told [T.A.] a
couple years [sic], when she was in 8th grade. So it had been a
couple of years since she told [T.A.]. And she had told [M.G.] I
believe several months, several months ago. It was around March, I
believe.

4    (ECF No. 90-7 at 210, 215-16.)

5    The state supreme court reasonably determined the claim lacks merit.

6    Swartwood's testimony was provided in the context of explaining Swartwood's experience

7    with child sexual abuse cases, her investigation process, and her attempts "confirm or

8    deny" J.Z.'s allegations. Swartwood's characterization of J.Z.'s "good details" did not

9    vouch for their truth; it explained J.Z. provided sufficient details to distinguish between

10   separate incidents of sexual abuse for purpose of preparing her report and conducting

11   her investigation. For example, they permitted Swartwood to investigate the allegations

12   to confirm or deny them by interviewing witnesses and preparing a targeted search

13   warrant for items that J.Z. alleged were involved in the abuse, i.e., a Tweety Bird

14   comforter, white blanket, dog bed, and carpet samples. Swartwood's testimony that telling

15   one's friends about abuse lends credence to the allegations provided a common-sensed

16   based explanation for Swartwood's investigation efforts to confirm or deny J.Z.'s

17   credibility, without providing any opinion whether J.Z. was truthful about the allegations

18   she conveyed to Swartwood or her friends. In the context of the entire trial, and given the

19   jury's verdict, the state supreme court reasonably concluded the claim lacks merit

20   because Swartwood's testimony did not evince a personal opinion about or assurance of

21   J.Z.'s truthfulness or credibility.

22   The state supreme court also reasonably determined the claim lacks merit

23   because, in the context of the trial, there is no basis to conclude that Swartwood's

24   testimony infected the trial with unfairness so as to make the resulting conviction a denial

25   of due process. The verdict strongly indicates the jury did not stray from its obligation to

26   be fair and unbiased as to the allegations alleged against Zanini. *See, e.g., Young*, 470

27   U.S. at 18 n.15 (holding that "[t]he jury acquitted respondent of the most serious charge

28   he faced" which reinforced the Supreme Court's conclusion "that the prosecutor's remarks

1  did not undermine the jury's ability to view the evidence independently and fairly.") Zanini

2  is not entitled to federal habeas relief for Ground 4(A).

3          **3.     Disposition of Ground 4(B)—Prosecutor's Statements**

4       Zanini claims the prosecutor personally vouched for J.Z.'s credibility by stating in

5  rebuttal that J.Z. "had every incentive in the world to tell the truth," after Swartwood

6  warned J.Z. during the post-recantation interview that she would be jailed if she lied at

7  trial. (ECF No. 36 at 35.) In the context of the evidence presented at trial, this argument

8  reasonably refers to the fact that, at the time of the post-recantation interview, J.Z. did not

9  recant the recantation, despite the detective's warning during that interview. The state

10  supreme court could reasonably conclude this claim lacks merit because nothing in the

11  prosecutor's remark evinced a personal belief in J.Z.'s honesty or referred to evidence in

12  the possession of the State that was not presented to the jury. (ECF No. 90-10 at 60.)

13       Zanini also asserts the prosecutor committed misconduct by asking J.Z. whether

14  she "told Detective Swartwood about some things" she "didn't talk about here" and "talked

15  about here some things that [she] didn't talk about then." (ECF No. 36 at 34.) The state

16  supreme court reasonably concluded this claim lacks merit. The state district court

17  instructed the jurors that their decision must be made on the basis of the evidence in the

18  case, and furthermore that "statements, arguments, and opinions of counsel were not

19  evidence in the case." (ECF No. 88-1 at 19.) The prosecutor's question did not suggest

20  the allegations were true or that the State possessed extra-record information that

21  confirmed J.Z. told the truth about any of her allegations. Moreover, J.Z., not the

22  prosecutor, informed the jury that she did not recall every instance of sexual assault by

23  Zanini, and she only recalled three instances of sexual assault that she both told

24  Swartwood and told the jury at trial. In the context of the entire trial it was reasonable to

25  conclude the prosecutor's question did not vouch or bolster J.Z's credibility and did not

26  so infect the trial with unfairness as to make the resulting conviction a denial of due

27  process. Zanini is not entitled to federal habeas relief for Ground 4(B).

28  ///

### D.    Ground 5—Preclusion of J.Z.'s Post-Recantation Interview

Ground 5 alleges Zanini was denied due process, a fair trial, the right to present a defense, and the right to confrontation, as guaranteed by the Fifth, Sixth, and Fourteenth Amendments, when the state district court denied his motion to play J.Z.'s post-recantation interview with Detectives Swartwood and Abernathy. (ECF No. 36 at 36-39.)

#### 1.    Additional Background

During J.Z.'s redirect examination, the State moved to admit all three of J.Z.'s interviews, including her post-recantation interview with Detectives Swartwood and Abernathy. (ECF No. 90-6 at 213-17.) Zanini objected that the recorded interviews were irrelevant and constituted hearsay, contending: "She testified that she recanted. She testified that she recanted another time. There's absolutely no reason to put in the entire transcript." (*Id.*) The state district court declined to admit the transcripts, ruling the state could simply ask J.Z. about her statements contained in them. (*Id.* at 230.)

Later, Swartwood testified she went to see J.Z. after J.Z. recanted to defense counsel because she "wanted to see how she was doing," and "there were concerns that maybe [Ronnie] was influencing her to recant and take away her statement," or had been threatening or harassing J.Z. (ECF No. 90-7 at 219-20.) On cross-examination, Swartwood testified her post-recantation visit to J.Z. was "partially" a welfare check "to see if anybody was dissuading her" which the detective explained would be a crime against [J.Z.]. (*Id.* at 227-28, 235-36.) Swartwood said that during the post-recantation interview, she told J.Z. it was her opinion the recantation was a lie. (*Id.* at 234-35.) Swartwood further testified she asked J.Z. "several times if Ronnie was threatening her," because she "wanted to make sure that he wasn't." (ECF No. 45-3 at 29.) Swartwood confirmed she told J.Z. not to lie on the witness stand. (*Id.* at 32-33.)

On redirect examination, defense counsel objected to Swartwood testifying about her perception whether the circumstances of the post-recantation interview were hostile or aggressive. (*Id.* at 37-39.) Defense counsel argued Swartwood's perception is irrelevant and if permitted to testify about her perception, the defense should be permitted

1   to play the entire post-recantation interview for the jury. (*Id.*) The State did not object to

2   playing the entire post-recantation interview provided all three of J.Z.'s recorded

3   interviews were played for the jury. (*Id.*) The defense argued the State opened the door

4   to playing only the post-recantation interview due to, among other things, Swartwood's

5   mischaracterization of the tone of the interview. (*Id.*) The state district court directed the

6   State to finish its redirect before it considered whether to allow the tape to be played. (*Id.*)

7   Swartwood thereafter testified she and Abernathy insisted J.Z. tell the truth during the

8   post-recantation interview, but that it was "absolutely not" a hostile, threatening, or

9   coercive environment. (*Id.* at 39-40.)

10       The state district court later brought up the defense's request to play the post-

11   recantation interview and noted that it had not listened to it. (ECF No. 90-9 at 108-09.)

12   Defense counsel argued the tape should be played so the jury could decide whether the

13   detectives applied pressure on J.Z. (*Id.* at 109-10.) The State argued it was not necessary

14   to play the post-recantation interview because the defense "got to ask all the questions

15   they want to show the influence" and if the interview was played, "in fairness, all

16   statements need to come in." (*Id.*) The defense argued the State mischaracterized the

17   interview as a "welfare check" because it was "much more like a suspect interview" and

18   the detectives used "interrogation techniques." (*Id.* at 111-13.) The State argued "to play

19   this one and not the others highlights the importance, and makes this somehow different

20   from the others and gives it undue weight. And that's completely unfair." (*Id.*) The state

21   district court ruled it was unnecessary to play the interview because the parties "all had

22   adequate opportunity to cross-examine" and "had the transcript" and if they "thought

23   anyone was mischaracterizing what happened," they could have "pointed to it." (*Id.*)

24       The state district court instructed the jury, "Remember, the court is not at liberty to

25   supplement the evidence." (ECF No. 88-1 at 25.) During deliberations the jury requested

26   "Detective's notes of interview with victim after recantation interview when Grandmother

27   was present." (ECF No. 90-10 at 75-76.) The state district court wrote a note back to the

28   jury stating, "I cannot supplement the record." (*Id.*)

1        **2.      Applicable Legal Principles**

2        "The right of an accused in a criminal trial to due process is, in essence, the right

3   to a fair opportunity to defend against the State's accusations." *Chambers v. Mississippi*,

4   410 U.S. 284, 294-303 (1973) (holding the rights to due process were violated because

5   of the imposition of a combination of state hearsay and party witness voucher rules had

6   deprived defendant the ability to either cross-examine an individual who had confessed

7   repeatedly to the murder in question or to call witnesses to discredit the repudiation of the

8   confession); *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) ("The Constitution [also]

9   guarantees criminal defendants 'a meaningful opportunity to present a complete

10  defense.'") (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). A defendant's

11  opportunity to be heard "would be an empty one if the State were permitted to exclude

12  competent, reliable evidence . . . when such evidence is central to the defendant's claim

13  of innocence." *Id.* This is because, "in the absence of any valid state justification,

14  exclusion of . . . exculpatory evidence deprives a defendant of the basic right to have the

15  prosecutor's case encounter and 'survive the crucible of meaningful adversarial testing.'"

16  *Crane,* 476 U.S. at 690-91 (quoting *United States v. Cronic*, 466 U.S. 648, 656 (1984)).

17      The Supreme Court has "never questioned the power of States to exclude

18  evidence through the application of evidentiary rules that themselves serve the interests

19  of fairness and reliability—even if the defendant would prefer to see that evidence

20  admitted." *Crane,* 476 U.S. at 690 (citing *Chambers*, 410 U.S. at 302). In fact, "state and

21  federal rulemakers have broad latitude under the Constitution to establish rules excluding

22  evidence from criminal trials," *United States v. Scheffer*, 523 U.S. 303, 308 (1998), and

23  the Supreme Court has stated its approval of "well-established rules of evidence [that]

24  permit trial judges to exclude evidence if its probative value is outweighed by certain other

25  factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury."

26  *Holmes v. South Carolina*, 547 U.S. 319, 320 (2006); *see also Nevada v. Jackson*, 569

27  U.S. 505, 509 (2013) ("Only rarely have we held that the right to present a complete

28  defense was violated by the exclusion of defense evidence under a state rule of

41

1    evidence.").

2              **3.    Disposition of Ground 5**

3              The Nevada Supreme Court stated, "Zanini additionally argues that the district

4    court erred in . . . failing to let him play a recording of an interview in its entirety . . . We

5    have carefully considered each of Zanini's remaining arguments, and we conclude that

6    they are without merit." (ECF No. 10-9 at 8 n.6.) The state supreme court's determination

7    is neither contrary to nor constitutes an unreasonable application of Federal law, as

8    determined by the Supreme Court, and is not based on any unreasonable determinations

9    of fact.

10             Under the circumstances, the state supreme court's conclusion that the claim lacks

11   merit is objectively reasonable as the exclusion of the post-recantation interview did not

12   deny Zanini the right to present a complete defense or to present witnesses on his own

13   behalf. Portions of the post-recantation interview that supported the defense theory that

14   the detectives pressured J.Z. to recant her recantation, such as Swartwood's comments

15   that J.Z. could be prosecuted for perjury if she lied at trial and that her baby would be

16   taken from her while she was jailed, were presented to the jury through the examinations

17   of J.Z., Swartwood, and Abernathy. Defense counsel had the opportunity to fully cross-

18   examine J.Z.,[17] Swartwood, Abernathy, and J.Z.'s grandmother, concerning the tenor of

19   the interview and about any exhibition of pressure, coercion, or interrogation tactics on

20   the part of the detectives that may have indicated they attempted to persuade J.Z. to

21   recant her recantation. Swartwood freely admitted she warned J.Z. she could be jailed if

22   she lied and that she and Detective Abernathy repeatedly admonished J.Z. to be truthful

23   at trial. Even if exclusion of the recording denied Zanini the right to present a defense, it

24   is reasonable to conclude the error was harmless as the defense's efforts to show the

25   detectives coerced J.Z. to recant her recantation during the post-recantation interview lost

26   steam when J.Z. testified the prosecutor assured her she would not be prosecuted no

27   matter what she said in her trial testimony. Accordingly, Zanini is not entitled to federal

28   _____

                    [17]J.Z. was subject to recall by the defense. (ECF No. 90-6 at 212.)

1    habeas relief for Ground 5.

2           **E.     Ground 6—Testimony Concerning Allegations of Abuse by Others**

3           Ground 6 alleges Zanini was denied due process and a fair trial guaranteed by the

4    Fifth, Sixth, and Fourteenth Amendments, when the state district court permitted J.Z. to

5    testify about her allegations of abuse by others and permitted J.Z.'s aunt to testify she

6    was sexually abused by J.Z.'s grandfather but did not report it. (ECF No. 36 at 39-46.)

7                  **1.     Additional Background**

8           Before trial, the defense argued J.Z.'s allegations that her grandfather had

9    molested her were admissible because when she made those allegations, she did not

10   disclose any abuse by Zanini, and argued "it has nothing to do with whether or not

11   grandpa molested her, it has to do with whether or not [Zanini] did." (ECF No. 38-16 at 7-

12   8.)

13          At trial, J.Z. testified that when she ran away from her grandparents' home in

14   November of 2007, police told her she needed to give them a reason why she could not

15   be returned to her grandparents' home so she told them her grandfather had molested

16   her when she was 6 years old. (ECF No. 90-6 at 25-27, 30-33, 187-93.) J.Z. testified she

17   later recanted those allegations but claimed her grandfather did in fact molest her, and

18   when the State asked J.Z. how long the molestation had gone on, Zanini objected that

19   they need not "go into the details of an unrelated incident." (*Id.* at 23-24.) The State argued

20   they did "because eventually their going to have to determine what was going on and her

21   truthfulness with regard to all incidents." (*Id.*) The state district court overruled the

22   objection, stating, "she can give the general outlines of it." (*Id.*) J.Z. testified her

23   grandfather molested her for about a year. (*Id.*) J.Z. went on to testified she wrote a note

24   to her grandfather requesting he tell her grandmother what happened because her

25   grandmother thought she lied about the abuse. (*Id.* at 39-40.) The defense objected to

26   J.Z. testifying about her grandfather's statement in reply, and the state district court ruled:

27          THE COURT: Okay. I think it is relevant to her experience on when she did
             or didn't report alleged abuse and (indiscernible) if she's—

28          DEFENSE COUNSEL: (indiscernible) reported at this point (indiscernible).

1
2      THE COURT: I know. And then as we know, she said it didn't happen. And
3      you know, now she's saying it did happen. So it's part of the background
       and it's part of, you know, the—the—whether the abuse happened or didn't
4      happen and the reporting or not reporting it, that are all relevant to how she
       reacts to the alleged abuse by the defendant, and whether she reports or
5      doesn't report, or when she reports it. So I'm going to allow it. Step back.
       And it is a statement against penal interest on the hearsay issue.

6      (ECF No. 90-6 at 42-43.) J.Z. thereafter testified her grandfather told her he couldn't tell

7      her grandmother "because they've been in love so long it would kill her." (*Id.*)

8            J.Z.'s paternal aunt, Taack, testified she was sexually abused by three family

9      members and the defense objected that it was irrelevant. (ECF No. 90-9 at 212.) The

10     State argued it wished to elicit Taack's testimony that she was thrice sexually abused but

11     never reported it. (*Id.* at 213-18.) The state district court sustained the objection to Taack

12     testifying that she was sexually abused. (*Id.* at 215-20, 225.) Before redirect, however,

13     the State requested permission to introduce Taack's testimony that she was molested by

14     J.Z.'s grandfather but never told anyone, on the grounds that it was relevant to J.Z.'s

15     character for truthfulness and credibility. (*Id.* at 234.) The State argued J.Z.'s molestation

16     by her grandfather is a specific instance in which it is more likely that J.Z. told the truth

17     and Zanini countered, "just because [Taack] was molested by [J.Z.'s] grandfather does

18     not per se and make it true that it happened to J.Z." (*Id.* at 238.) The state district court

19     ruled the testimony was relevant to J.Z.'s credibility, J.Z.'s "credibility is an issue and is

20     important," witnesses had opined that J.Z.'s an untruthful person," and permitted the State

21     to ask Taack whether she was molested by J.Z.'s grandfather and whether she believed

22     J.Z. was truthful when J.Z. alleged he molested her. (*Id.* at 237, 240-41.) Taack testified

23     she was molested by J.Z.'s grandfather and she did not go to J.Z.'s defense when J.Z.

24     accused him of molesting her. (*Id.* at 241-42.)

25            **2.      Disposition of Ground 6**

26            The Nevada Supreme Court ruled the claim is without merit: "Zanini additionally

27     argues that the district court erred in . . . making improper evidentiary rulings regarding

28     hearsay, incomplete and misleading testimony, and inflammatory and prejudicial

                                            44

1    testimony . . . We have carefully considered each of Zanini's remaining arguments, and

2    we conclude that they are without merit." (ECF No. 10-9 at 8 n.6.) The state supreme

3    court's conclusion that this Ground 6(A) lacks merit is neither contrary to nor constitutes

4    an unreasonable application of Federal law, as determined by the Supreme Court, and is

5    not based on an unreasonable determination of the facts.

6    The Court defers to the state court's conclusion that testimony from J.Z. and Taack

7    concerning allegations of sexual abuse at the hands of J.Z.'s paternal grandfather and

8    others did not violate state law. The state supreme court's rejection of the federal due

9    process claim was objectively reasonable under the circumstances of this case. The jury

10    was entitled to draw reasonable inferences about J.Z.'s credibility based on her testimony

11    about prior allegations of sexual abuse against her grandfather (and others) as they were

12    highly relevant to the jury's determination of J.Z.'s overall character for truthfulness for

13    purposes of determining her credibility about the sexual assault charges alleged against

14    Zanini. The jury could also reasonably draw inferences about J.Z.'s credibility from

15    Taack's testimony that she was molested by J.Z.'s grandfather, did not report the abuse,

16    and did not support J.Z. when J.Z. made those allegations. The defense was permitted

17    to cross-examine J.Z. to bring out the fact that, alongside her accusations against others,

18    she passed on opportunities to tell police about the abuse she alleges Zanini perpetrated

19    during the same times that she made accusations against others. It is further reasonable

20    to conclude the testimony of J.Z. and Taack did not require the defense to disprove J.Z.'s

21    allegations against her grandfather. Because J.Z.'s credibility was critical to the jury's

22    determination, it was reasonable to conclude the testimony was not of such a quality as

23    to deny Zanini a fair trial. Accordingly, because Zanini has not demonstrated unfairness

24    and the Supreme Court has not held that "irrelevant or overtly prejudicial evidence

25    constitutes a due process violation," *Yarborough*, 568 F.3d at 1101, Zanini has failed to

26    show that there was no reasonable basis for the Nevada Supreme Court to deny

27

28

1   relief.[18] *See Harrington*, 562 U.S. at 98. Zanini is therefore not entitled to federal habeas

2   corpus relief for Ground 6.

3       **F.    Ground 7—Admission of Zanini's Booking Photograph**

4       Ground 7 alleges Zanini was denied due process and a fair trial, as guaranteed by

5   the Fifth, Sixth, and Fourteenth Amendments, when the state district court admitted

6   Zanini's booking photograph at trial. (ECF No. 36 at 46-48.)

7       J.Z. testified Zanini previously kept his hair long and it hurt his back to brush it, so

8   although her aunt usually brushed it, she sometimes asked J.Z. to do so. (ECF No. 90-6

9   at 124-25.) J.Z. said she did not recall hair brushing as a precursor to an episode of sexual

10  abuse. (*Id.*) The State moved to admit a photograph of Zanini[19] depicting him with long

11  hair because he looked so different at trial that his sister did not recognize him. (*Id.*)

12  Defense counsel objected that the photograph was an irrelevant and prejudicial "jail

13  photo" but the state district court overruled the objection and admitted the photograph

14  stating, "it would help explain the whole brushing the hair thing, I guess." (*Id.* at 125-128.)

15  Defense counsel later reminded the court that although the photograph was prejudicial,

16  defense counsel had elicited testimony that Zanini was in jail. (*Id.* at 284.) Later at trial,

17  J.Z.'s friend, T.A., testified J.Z. told her that Zanini "would call her into a room and ask her

18  to brush his hair, and that would be like a cover for it." (ECF No. 90-7 at 116.) Detective

19  Swartwood, however, testified J.Z. did not tell her that Zanini would call her to his room

20  to brush his hair as a starting point for sexual abuse. (ECF No. 90-9 at 9-10.)

21      Requiring a defendant to wear prison garb at trial is "inherently prejudicial" and

22  denies due process. *Williams*, 425 U.S. at 512. The Court in *Williams* explained that

23  prison clothing is a "constant reminder of the accused's condition," and "is so likely to be

24

25      [18]Zanini claims in his reply brief that the state supreme court's determinations for
    Ground 6 are contrary to *Chambers*, 410 U.S. at 302–03. (ECF No. 86 at 54-55.)
26  *Chambers* held the combined effect of depriving the defendant the right to cross-examine
    a witness who had confessed to the murder on trial and the right to call witnesses to refute
27  the confessor's recantation of his confessions violated his constitutional rights. *See supra*
    at p. 41. But Zanini was not similarly deprived of the opportunity to cross-examine J.Z.,
28  Taack, and others, or to call witnesses and present evidence.

        [19](ECF No. 42-2 at 2.)

1    a continuing influence throughout the trial," that "an unacceptable risk is presented of

2    impermissible factors coming into play." *Id.* at 504-05.

3         The Nevada Supreme Court rejected this claim, stating that it "carefully considered

4    each of Zanini's remaining arguments" and concluded "they are without merit. (ECF Nos.

5    10-9 at 8 n.6, 90-1 at 46-48.) The state supreme court's determination is neither contrary

6    to nor constitutes an unreasonable application of Supreme Court authority and is not

7    based on an unreasonable determination in the record. The trial video confirms Zanini

8    wore street clothes in the presence of the jury and the jail calls attested to the jury that

9    Zanini was, at some point, incarcerated for purposes of the case. (Manually Filed Exhibit

10   72.) Federal habeas corpus relief is not warranted for Ground 7.

11        **G.    Ground 8—Failure to Produce Exculpatory Evidence**

12        Ground 8 alleges Zanini was denied due process and a fair trial, as guaranteed by

13   the Fifth, Sixth, and Fourteenth Amendments, because the State suppressed (A)

14   exculpatory and impeaching evidence arising out of a meeting the prosecutor and

15   investigator had with J.Z. on September 18, 2009, and (B) J.Z.'s September 25, 2009,

16   post-recantation interview with the detectives. (ECF No. 36 at 49-65.)

17        **1.    Additional Background**

18        On September 21, 2009, the State requested a trial continuance because, on the

19   prior Thursday (September 17, 2009) the defense provided a transcript dated August 28,

20   2009, in which J.Z. recanted her allegations. (ECF No. 38-11 at 3.) The prosecutor said

21   she "spoke" with J.Z. after the recantation and the State needed to "investigate the

22   recant." (*Id.* at 3-4) The defense had not yet provided the State with a recording of the

23   recantation interview but agreed to do so. (*Id.* at 9.) Trial was continued to November 16,

24   2009. (*Id.* at 11.) That same day, and for the first time in the case, the State noticed the

25   District Attorney's investigator, Craig Fabert, as a trial witness. (ECF No. 38-8 at 3.)

26        In October of 2009, the defense moved to compel disclosure of "any and all notes,

27

28

47

audio recordings or video recordings of interviews completed after September 24"[20] and indicated the defense was aware that representatives of the District Attorney's Office contacted J.Z. at her school on September 25, 2009, to question her about her recantation. (ECF No. 38-12 at 6.) The State filed an opposition indicating it was aware of, and intended to comply with, its discovery obligations. (ECF No. 38-13.) On November 9, 2009, the parties discussed J.Z.'s post-recantation interviews:

> DEFENSE COUNSEL: Basically, Judge, what we found out happened was, the last time that we were in court if you'll recall we were before, just before—or we were here on calendar call back about five weeks ago maybe. And I had just had an interview with the alleged victim in this case,—
>
> THE COURT: Yes.
>
> DEFENSE COUNSEL: —J.Z.
>
> THE COURT: Yes.
>
> DEFENSE COUNSEL: And I had audio recorded that interview and had provided the transcript to the State. And since then, I have also provided the actual audio recording.
>
>     It's our understanding that since that point in time the State has had another interview with her. That they pulled her out of classes at school and had a second interview with her. And we were just—we would assume at that point in time, since we had audio taped our interview, that they would have audio taped theirs. I haven't received anything like that from the State.
>
> THE STATE: I did pull her out of school. And I made those representations the last time. I did not audio tape it. I don't even—I didn't even write any notes—if I did make—I don't even think I had a pad with me. But, I think that would be certainly work product in any event, my notes on any case. And I absolutely didn't tape record it, so—
>
> THE COURT: Okay. So, apparently there wasn't any recording of that interview, and counsel's notes I'm not going to order produced in this context. So, if there's any—I don't know if there were any—well, if that's all that exists then I'm not going to order anything further. But, obviously you have your continuing obligations with respect to discovery on witness interviews.

(ECF No. 38-16 at 4-5.) A week later and before jury selection, the prosecutor explained that it would provide the defense with a recorded post-recantation

---

[20]The defense motion appears to have mistakenly asserted the transcripts of the recantation interview were provided to the State on September 24, 2009. As noted, however, the record shows the transcripts were provided on September 17, 2009. Nonetheless, the defense may have provided the State with the recorded recantation on September 24, 2009.

1    interview dated September 25, 2009:

2         THE STATE: [I] also let them know, and I don't know—I didn't know. I'm told
          during my pretrial that Detective Swartwood, after the child in this case
3         recanted, she went over to check on her, she—

4         THE COURT: I'm sorry, say that again.

5         THE STATE: Detective Swartwood went to check on the—on the child after
          the recant.
6
          THE COURT: Uh-huh.
7
          THE STATE: Had a conversation with her. We have just learned that that
8         was recorded. She is in the process of sending it over. That was one of the
          other things we were waiting for. I got the follow-up on [Taack] instead of
9         the follow-up on J.Z. And so as soon as it's ready, if it's copied to a disk, it
          will be sent over. That's—that's what I know. I don't know what's on it other
10        than—

11        THE COURT: Had we not asked this detective previously if it was recorded?

12        THE STATE: You know, it never occurred to me it would have been.

13        THE COURT: Okay, didn't we have a specific motion about that last week,
          and we were told it wasn't recorded?
14
          THE STATE: But that was my conversation with her.
15
          . . .
16
          THE STATE: And again, I'm not denying that [Zanini's counsel] is entitled
17        to it. If I had known about it, I would absolutely provided [sic] it. As soon as
          I found out, I—I immediately threw the detective out of my office. We did not
18        finish the pretrial. I asked her if there was somebody that could e-mail it to
          me. She said no. I said then you need to go now. We'll do this some other
19        time. You need to get that to me as soon as possible.

20

21   (ECF No. 40-2 at 11-14.) The prosecutor confirmed the interview with the detectives was

22   audio recorded, but not transcribed. (*Id.* at 14-15.) The prosecutor confirmed she "at all

23   times asked Detective Swartwood for any and all CDs." (*Id.*) That same day, the State

24   submitted to the court a transcript for a post-recantation interview with J.Z. by Detectives

25   Swartwood and Abernathy. (ECF No. 90-5 at 2.) Defense counsel later confirmed receipt

26   of the tape recording of the September 25, 2009, post-recantation interview at the end of

27   the day on [November] 16th and that a transcript of the interview was provided to the

28   defense on November 17th after the first day of jury selection. (ECF No. 42-1 at 270-80.)

49

1    During the last break before the jury was empaneled, Zanini filed a motion to

2  dismiss the charges claiming, *inter alia*, the State had violated *Brady* by withholding the

3  September 25, 2009, post-recantation interview. (*Id.* at 209-13.) After the jury was sworn,

4  the court heard argument on the motion and defense counsel argued the defense had

5  filed a motion for *Brady* material, the court heard argument on that motion on November

6  9, 2009, and the prosecutor had represented there were no audio-taped interviews

7  following J.Z.'s August 28, 2009, recantation interview with defense counsel. (*Id.* at 268.)

8  The prosecutor argued the September 25, 2009, post-recantation interview did not

9  constitute *Brady* material because it did not include anything exculpatory and the defense

10  should have filed the motion when they learned about it on the prior Monday, rather than

11  waiting until the jury was sworn. (*Id.* at 271.) The prosecutor stated, "When I found out

12  about [the recantation], my investigator and I went down on Friday. And I'm telling you as

13  an officer of the court, I'll be sworn, [m]y investigator was there. He can also make—we

14  have never pressured that kid. We sat her down, what's going on. And from that—she

15  doesn't want to do it anymore." (*Id.* at 276.) The prosecutor further explained:

16       She's stressed out, she's worried about her baby, she's getting too
         much pressure, she just—she doesn't care. Yeah, he molested her, but so
17       did everybody else. And she's going to move on . . . It just—doesn't care
         anymore. Never, ever, ever said it didn't happen. In fact, went on to say that
18       it did happen. And just—it was just easier this way.

19       . . .

20       And so I said to [Swartwood], "Go out, make sure she's okay and not
         getting heat from anyone, and see if there's enough to file on Ronnie."
         Detective Swartwood called me later. She said, "I went out and talked to
21       her, she's not really giving us enough to go on Ronnie." And that was pretty
         much it. I said, "Is she doing a full recant?" "No."
22
         And I never asked about a statement, because I never dreamt she
23       would. My thought was she would go and say, "Hey, what's going on." If
         there was something to file on Ronnie, then she would take a voluntary
24       statement, because that would be submitted as a packet so that we could
         actually file charges against Ronnie. Because she told me it never got to
25       that level, I had no idea.

26       Certainly, Teresa Zanini never called me and told me anything about
         anything being recorded, or there being a statement. So of course I don't
27       care if they have it. I give everything. I've got nothing to hide. I had no idea
         Swartwood—as soon as she mentioned it in my office at the pretrial on
28       Monday morning, she looked at me, I looked at her, I went, "Come on."

1

2

3

4

> And I kicked her out immediately; I've already said that. I sent her immediately back to get the recording as soon as possible and provide it. We came back, I told the defense that it was coming. We were actually 15 minutes late that morning trying to get it off the email. Told them it was coming. They never made a motion to continue. They never said anything, they never did anything, we provided it at the end of the day. Clearly according to this, they had the transcript on the 16th.

5

6   (*Id.* at 278-79.) Defense counsel clarified they received the taped recording of the

7   interview at the end of the day on the 16th and received the transcript at the end of the

8   day on the 17th. (*Id.* at 280.) The state district court denied the motion finding, among

    other things, the interview was not suppressed:

9

10

11

12

> THE COURT: [N]ow, was the recording of the meeting required to be produced? Absolutely. Should have been produced right away. And whether or not [the Prosecutor] had it, the police had it, and it's required to be produced. And having said that, I believe that [the Prosecutor] arranged for it to be produced as soon as she became aware of it. We all learned about that on Monday.

> And so yes, it should have been produced sooner. But it was produced prior to trial, and two days before this motion was filed today. And so I'm certainly not going to dismiss the case now based on that not having been produced prior to Monday. If anything, the remedy would have been a continuance. So we're not going there at this point in the case. Not based on this, which we've known since Monday.

13

14

15

16   (*Id.* at 288-89, 295.)

17   Investigator Fabert testified he contacted J.Z. "at least four or five times" during the

18   course of his involvement in the case. (*Id.*) He said he "contacted her after we were

19   informed of a recant" on September 18, 2009 and spoke with her in a counseling office at

20   her high school. (*Id.* at 290-91.) When asked to describe the interview, he stated: "it really

21   wasn't much of an interview in all honesty. We were there for probably about 40, 45

22   minutes. I'd say about 30 of that was just talking personal stuff, you know, how her life

23   was going, her baby, things of that nature" and "it was the last five minutes, we discussed

24   the recant. It was real laid back, real relaxed." (*Id.* at 291-92.) He said J.Z. never told him

25   her allegations were untrue and never recanted her allegation during that interview. (*Id.*

26   at 291, 294.) On cross-examination, Fabert testified he did not know what J.Z. was going

27   to say and he did not audiotape his post-recantation interview with her. (*Id.* at 309.) He

28   said he can provide nothing except his statements about what happened during the

51

interview. (*Id.*) Although he admitted he took a recorder to the interview, he said "it didn't turn out to be an interview," but had it been an interview, he would have recorded it. (*Id.* at 309-11.)

### 2.      Applicable Legal Principles

"The suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment irrespective of the good faith or bad faith of the prosecution." *Brady,* 373 U.S. at 87. "When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within [the *Brady*] rule." *Giglio v. United States*, 405 U.S. 150, 154 (1972) (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). The *Brady* rule encompasses evidence "known only to police investigators and not the prosecutor." *Kyles v. Whitley,* 514 U.S. 419, 438 (1995). The duty to produce such material arises even if the defense request is non-specific or if there is no request at all, however, *Brady* does not establish a "duty to provide defense counsel with unlimited discovery of everything known by the prosecutor." *United States v. Agurs,* 427 U.S. 97, 106-07 (1975).

"There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). "A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles*, 514 U.S. at 434 (quoting *Bagley*, 473 U.S. at 678). "Mere speculation that some exculpatory material may have been withheld is unlikely to establish good cause for a discovery request on collateral review." *Strickler*, 527 U.S. at 286. A *Brady* violation "may be cured . . . by belated disclosure of evidence,

52

1   so long as the disclosure occurs 'at a time when disclosure would be of value to the

2   accused.'" *United States v. Gamez-Orduno*, 235 F.3d 453, 461 (9th Cir. 2000) (quoting

3   *United States v. Span,* 970 F.2d 573, 583 (9th Cir.1992)).

4        "Cause and prejudice necessary to overcome the default of a *Brady* claim parallel

5   the second and third elements of a *Brady* violation." *Martinez v. Ryan*, 926 F.3d 1215,

6   1227 (9th Cir. 2019) (citing *Banks v. Dretke*, 540 U.S. 668, 691 (2004)). "Those elements

7   are: '[(2)] that evidence must have been suppressed by the State, either willfully or

8   inadvertently'; and [(3)] "'prejudice must have ensued'." *Martinez*, 926 F.3d at 1227

9   (quoting *Strickler*, 527 U.S. at 282). "Thus, a petitioner establishes cause when the reason

10  for his failure to bring a timely *Brady* claim is the government's suppression of the relevant

11  evidence, and establishes prejudice when the suppressed evidence is material for *Brady*

12  purposes." *Id.* (citing *Banks*, 540 U.S. at 691).

13              **3.      Ground 8(A)—Failure to Disclose Interview with Faber**

14        Ground 8(A) alleges the State violated Zanini's rights to due process and a fair trial

15  by continuing to suppress exculpatory and impeachment evidence obtained during J.Z.'s

16  interview with the prosecutor and Fabert on September 18, 2009. (ECF No. 36 at 54-60.)

17  Zanini fails to establish cause or prejudice to excuse the procedural default of this claim.

18  Suppression of evidence by the State presupposes *Brady* material exists. The State

19  disclosed their meeting with J.Z. before trial and stated no recording or discoverable notes

20  existed for that meeting. The State disclosed Fabert's attendance at the prosecutor's

21  meeting with J.Z. before Fabert's testimony, and the defense cross-examined Fabert

22  about J.Z.'s statements during that meeting. Fabert testified he had nothing to offer

23  concerning the meeting with J.Z. other than his testimony. Zanini speculates J.Z. recanted

24  at that meeting, however, Fabert testified J.Z. never recanted at the meeting or told him

25  the allegations against Zanini were untrue. Thus, Zanini fails to establish cause and

26  prejudice to overcome the default of this *Brady* claim and Ground 8(A) will be dismissed.

27              **4.      Ground 8(B)—Disclosure of September 25, 2009, Interview**

28        Ground 8(B) alleges the State violated Zanini's rights to due process and a fair

53

1    trial, and violated its *Brady* obligations, by suppressing the September 25, 2009, interview

2    with J.Z. (ECF No. 36 at 60-65.)

3           The Nevada Supreme Court rejected this claim on direct appeal:

4                  Zanini argues that the State withheld exculpatory evidence until the
       eve of trial in violation of *Brady v. Maryland*. Zanini contends that the most
5      important of this exculpatory evidence was a recording of a welfare check
       interview with J.Z. that was conducted by the police after J.Z. attempted to
6      recant her story. Zanini asserts that this interview was intended to intimidate
       J.Z. into taking back her recantation, which amounts to witness tampering,
7      and that J.Z.'s failure to give in to this pressure constitutes exculpatory
       evidence. Zanini argues that the State's failure to produce this recording
8      until the eve of trial prejudiced his trial preparation; therefore, dismissal
       based on a *Brady* violation was warranted, and the district court abused its
9      discretion in denying his motion to dismiss.

10                 [FN 1] The district court denied Zanini's motion because the
       evidence at issue was provided to him before trial. We note
11     that Zanini failed to request a continuance.

12     We conclude these arguments are without merit.

13                 [FN 2] Zanini similarly fails to meet the criteria for a *Brady*
       violation in his claim based on the State's late production of
14     jail records, impound sheets, search warrants, and
       convictions for two men convicted of sexual abusing J.Z.

15
              This court reviews alleged *Brady* violations de novo. *State v. Bennett*,
16     119 Nev. 589, 599, 81 P.3d 1, 7–8 (2003). In *Brady v. Maryland*, the United
       States Supreme Court held that the State violates due process if it withholds
17     exculpatory evidence. *Wallace v. State*, 88 Nev. 549, 551–52, 501 P.2d
       1036, 1037 (1972) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)).
18     "Exculpatory evidence is defined as evidence that will explain away the
       charge." *King v. State*, 116 Nev. 349, 359, 998 P.2d 1172, 1178 (2000); *see*
19     NRS 172.145. "'[T]here are three components to a *Brady* violation: the
       evidence at issue is favorable to the accused; the evidence was withheld by
20     the state, either intentionally or inadvertently; and prejudice ensued, i.e., the
       evidence was material.'" *Browning v. State*, 120 Nev. 347, 369, 91 P.3d 39,
21     54 (2004) (quoting *Mazzan v. Warden*, 116 Nev. 48, 67, 993 P.2d 25, 37
       (2000)). *Brady* violations cannot be based on speculation. *Strickler v.*
22     *Greene*, 527 U.S. 263, 286 (1999).

23            Zanini has failed show that the State violated *Brady*. First, the
       evidence at issue is not favorable to Zanini. There is no indication from our
24     review of the transcript that the police detectives were attempting to
       intimidate J.Z. It is clear that the detectives were trying to determine if J.Z.
25     was being pressured and if she felt safe in her environment. The recorded
       conversation did not explain away the charges against Zanini; it was not
26     exculpatory. *See King,* 116 Nev. at 359, 998 P.2d at 1178. Second, the
       State did not withhold the evidence. Although it was produced late, the State
27     turned the evidence over to Zanini before the trial began and as soon as the
       State was aware the evidence existed. Third, Zanini has failed to show that
28     any prejudice ensued. Zanini's main argument is that knowledge of the
       evidence "could have entirely changed [his] trial strategy." If this were the

case, his attorneys should have immediately filed for a continuance; however, they did not. Moreover, Zanini was still able to use the information received from the interview to cross-examine witnesses.

The district court properly determined that there was no witness tampering that would justify dismissal based on the detectives' interview with J.Z. Accordingly, we conclude that there was no <u>Brady</u> violation warranting dismissal below or reversal upon appeal.

(ECF No. 10-9 at 2-4.) The state supreme court's determination that the interview was not suppressed is neither contrary to nor constitutes an unreasonable application of Federal law, as determined by the Supreme Court, and is not based on an unreasonable determination of the facts in the state court record.

The state court record confirms the State disclosed the audiotape of the interview on the evening before the commencement of jury selection and the prosecutor disclosed it as soon as practicable after becoming aware of its existence. Moreover, the state supreme court reasonably determined Zanini was not prejudiced as there is no reasonable probability the result of the proceedings would have been different had the disclosure of the interview been made earlier. The record confirms defense counsel thoroughly cross-examined J.Z. and Swartwood concerning the contents and circumstances of the interview, including J.Z.'s statements that she told defense counsel she wanted to recant because she did not want Zanini to go to jail for something he did not do and just because she was mad at him. Zanini is not entitled to federal habeas relief for Ground 8(B).

## H.    Ground 9—Amendment of the Information

Ground 9 alleges Zanini was denied due process and a fair trial, as guaranteed by the Fifth, Sixth, and Fourteenth Amendments, when the state district court allowed the State to file an amended information at the close of evidence. (ECF No. 36 at 65-68.)

### 1.    Additional Background

The information charged Zanini with sexually assaulting J.Z., between December 13, 2000, and March 31, 2008, when she was under 16 years of age. (ECF No. 10-1.) An amended information alleged 17 charges, including 15 counts of sexual assault between

55

1    December 13, 2000, and December 12, 2005, when J.Z. was under 14 years of age, plus

2    2 counts of sexual assault between March 1, 2008, and March 30, 2008, when J.Z. was

3    under 16 years of age, in violation of NRS §§ 200.364; 200.366.[21] (ECF No. 10-2.)

4          On the morning of the fifth day of trial the State alerted the parties that it wished to

5    file a second amended information "to comport with the dates as testified to." (ECF No.

6    90-9 at 3.318-19.) The dates for Count 2 were unchanged and Zanini did not object to the

7    amendment of Count 1, which expanded the time frame for the offense from March 1,

8    2008, through March 30, 2008, to January 1, 2008, to July 17, 2008. (*Id.* at 321.) After

9    the parties rested their respective cases, Zanini did, however, object to the changed dates

10   for Counts 3-17:

11          [DEFFENSE COUNSEL]: [J]udge, just for the record, we'd just be
           objecting to the changes to the Information that was provided to us at the
12         beginning of trial. My understanding is, in just looking at this briefly, is that
           originally the Information contained specific years on all of the counts under
13         14 years of age. So that would be Counts 3 through 17. It was almost
           sequential between December '00 and '01, these however many Counts
14         occurred. And then '01 to '02 and '02 to '03 for all of the Counts between 3
           and 17.
15
           And now, at the end of testimony, after J.Z. left the stand, the State
16         is now amending to change the dates from December 13th, 2000 to
           December 12, 2006 on all of the Counts of minor under the age of 14. We
17         object to the lack of notice. We were not allowed to cross-examine as to any
           of the dates in this wide of a range. We were under the impression that it
18         was so many per year and that would be our objection for the record.

19   (*Id.* at 314, 321.) The State argued it could amend the information any time before the

20   verdict "if no additional or different offense is charged and if the substantial rights of the

21   defendant are not prejudiced," that time is not an element of the offenses, and the jury

22   instructions would inform the jury there is no requirement the child recall the specific dates

23   on which the offenses were committed. (*Id.* at 321-22.) The state district court overruled

24   the defense objection because "under the case law," "they are permitted to use a date

25   range along those lines," "particularly having a minor who is doing her best to recall when

26   the events occurred." (*Id.* At 323.) The state district court instructed the jury, "Where a

27

28         [21]*See* NRS § 200.364, *as enacted by* Laws 1995, p. 700; NRS § 200.366, *as*
     *amended by* Laws 2007, c. 528, § 7.

1  child has been the victim of sexual assault, and does not remember the exact date of the

2  act, the State is not required to prove a specific date, but may prove a time frame within

3  which the act took place. (ECF No. 88-1 at 15.)

4                         **2.**      **Additional Legal Principles**

5        "A person's right to reasonable notice of a charge against him, and an opportunity

6  to be heard in his defense—a right to his day in court—are basic in our system of

7  jurisprudence . . ." *In re Oliver*, 333 U.S. 257, 273 (1948) (footnote omitted); *see also Cole*

8  *v. Arkansas,* 333 U.S. 196, 201 (1948) ("No principle of procedural due process is more

9  clearly established than that notice of the specific charge, and a chance to be heard in a

10  trial of the issues raised by that charge, if desired, are among the constitutional rights of

11  every accused in a criminal proceeding in all courts, state or federal."); *Gautt v. Lewis*,

12  489 F.3d 993, 1003-05 (9th Cir. 2007) (recognizing, for purposes of AEDPA, "it is 'clearly

13  established' that a criminal defendant has a right, guaranteed by the Sixth Amendment,

14  and applied against the states through the Fourteenth Amendment, to be informed of any

15  charges against him, and that a charging document, such as an information, is the means

16  by which such notice is provided.").

17        In Nevada, a state district court "may permit an indictment or information to be

18  amended at any time before verdict or finding if no additional or different offense is

19  charged and if substantial rights of the defendant are not prejudiced." NRS § 173.095. A

20  district court decision to allow an amendment is reviewed for an abuse of discretion, but

21  "that discretion is abused if 'an additional or different offense is charged' or the 'substantial

22  rights of the defendant are prejudiced.'" *Green v. State,* 576 P.2d 1123, 1123 (Nev. 1978).

23  "Unless time is an essential element of the offense charged, there is no absolute

24  requirement that the state allege the exact date, and the state may instead give the

25  approximate date on which it believes the crime occurred." *Cunningham v. State,* 683

26  P.2d 500, 502 (Nev. 1984) (holding time is not an element of sexual assault, attempted

27  sexual assault and lewdness with a minor, therefore, the State in its information charging

28  such offenses was not absolutely required to allege exact date of their commission). "This

57

1   does not mean, however, that the state may fail to allege any date whatsoever in the

2   information or the indictment, since such a failure would clearly deprive the defendant of

3   adequate notice of the charge against him" and "should, whenever possible, allege the

4   exact date on which it believes a crime was committed, or as closely thereto as possible."

5   *Id.*

6                          **3.      Disposition of Ground 9**

7          The Nevada Supreme Court rejected this claim on direct appeal: "Zanini

8   additionally argues that the district court erred in allowing the State to file a second

9   amended information . . . We have carefully considered each of Zanini's remaining

10  arguments, and we conclude that they are without merit." (ECF No. 10-9 at 8 n.6.) The

11  state supreme court's conclusion that this claim lacks merits is neither contrary to nor

12  constitutes an unreasonable application of Supreme Court authority and is not based on

13  an unreasonable determination of the facts in the state court record.

14         The dates of the sexual assaults were not substantive elements of the crimes

15  alleged under state law. J.Z.'s statement to Detective Swartwood put Zanini on notice that

16  the alleged sexual assaults occurred over a time period that started in the year 2000,

17  when J.Z. was 8 years old, and continued up to and including July of 2008 when she

18  reported her allegations to Swartwood. J.Z.'s statement to Swartwood informed the

19  defense that J.Z. recalled, at that time, 11 incidents of sexual assault, including four types

20  of sexual abuse. J.Z. moreover informed Swartwood that she experienced sexual assault

21  about twice a month between the ages of 12 and 15 and she did not, at the time of the

22  interview, recall every instance. The defense strategy was not focused on attacking

23  individual instances of assault; instead, the defense argued the State failed to meet its

24  burden of proof because J.Z. lacked credibility. As such, defense counsel sought, during

25  the examination of J.Z., Swartwood, and other witnesses, to expose discrepancies about

26  the dates and details of each incident of assault contained in J.Z.'s trial testimony versus

27  her statements to Swartwood and others. In closing remarks, defense counsel argued

28  J.Z. lacked credibility and was "clearly struggling with the details of her statements" as

"it's different in the court than what she told Detective Swartwood . . ." Defense counsel's argument that Zanini was prejudiced by the lateness of the amendment because J.Z. had already left the witness stand lacks merit because J.Z. was subject to recall by the defense and the defense was aware of the amendments before resting its case. *See supra* at p. 44 n.17. Thus, the state supreme court could reasonably conclude on this record that Zanini was not denied his federal due process right to notice, an opportunity to prepare a defense, and to be heard concerning the charges, and that any variations between J.Z.'s initial statements to police and her testimony at trial did not affect his substantial rights.[22] For the foregoing reasons, Zanini is not entitled to federal habeas corpus relief for Ground 9.[23]

The Court will, however, issue a certificate of appealability for Ground 9 as to the convictions for Counts 1 and 17. Jurists of reason could debate whether the second amended information merely permitted the State to change the date for the offenses that were alleged in the amended information or instead permitted the State to amend the information to include new instances of sexual assault for which Zanini did not receive notice prior to trial. As such, reasonable jurists could find the state supreme court's determination objectively unreasonable and the Court's denial of Ground 9 as to either Count 1 or 17 debatable or incorrect. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000).[24]

---

[22]*Cf. Schiro v. Farwell*, 225 F. App'x. 591, 594 (2007) (finding that although the information alleged sexual penetration that differed from the facts concerning sexual penetration at trial, the variance did not affect the defendant's substantial rights because the "central theory, namely, that the minor child had fabricated or fantasized the entire set of events, was an appropriate defense to any theory of sexual penetration.").

[23]Zanini's reliance on *Valentine v. Konteh*, 395 F.3d 626, 632-33 (6th Cir. 2005) is misplaced. (ECF No. 86 at 90.) The alleged victim in *Valentine* did not describe specific incidents of abuse; rather the victim described "typical" abusive behavior, the "typical" abuse occurred twenty or fifteen times, and no evidence as to the number of incidents was presented. Zanini's federal authorities based on claims brought under the Fifth Amendment (ECF No. 86 at 93) do not control. A Sixth Amendment notice claim is different from a Fifth Amendment constructive amendment claim and the latter has not been incorporated by the Fourteenth Amendment. *See Gautt*, 489 F.3d at 1004 n.10.

[24]In her statement to Swartwood, J.Z. said Zanini conducted sexual intercourse with her in March of 2008 on her bed in her bedroom and Count 1 of the amended information alleged an incident of sexual intercourse in March of 2008. (ECF Nos. 10-2

I.      **Ground 10—Effective Assistance of Counsel**[25]

Ground 10 alleges Zanini was denied effective assistance of counsel in violation of the Sixth and Fourteenth Amendments. (ECF No. 36 at 69-83.)

1.      **Standards for Evaluating Effective Assistance of Counsel**

A petitioner claiming ineffective assistance of counsel must demonstrate (1) the attorney's "representation fell below an objective standard of reasonableness[;]" and (2) the attorney's deficient performance prejudiced the petitioner such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. A court may first consider either the question of deficient

---

at 8, 90-4 at 57-60.) At trial, however, J.Z. did not testify about an incident of sexual assault in March in her bedroom; rather, she testified Zanini conducted sexual intercourse with her in January of 2008 in his bedroom during which someone turned the doorknob to the adjoining bathroom. (ECF No. 90-6 at 90-91.) The State was permitted to file a second amended information, to include the January incident, i.e., expand the date of the offense to January 1, 2008, and July 17, 2008. (ECF No. 90-8 at 3.) Reasonable jurists could debate whether the second amended information merely expanded the date for the crime corresponding to the initially noticed allegations (sexual intercourse in her bedroom) or instead permitted the State to allege a new and different crime of sexual assault (sexual intercourse on his bed) for which there was no notice to the defense prior to trial.

In her statement to Swartwood, J.Z. said Zanini conducted sexual intercourse with her in a white car from behind while she kneeled on the passenger seat facing the driver's seat when she was 12 years old (2004-2005) and that on a separate occasion when she was 11 years old, he made her perform fellatio on him in his Santa Fe vehicle. (ECF No. 90-4 at 43-49.) Count 17 of the amended information charged sexual intercourse while J.Z. was under 14 years of age between December 13, 2004, and December 12, 2005. (ECF No. 10-2 at 8.) At trial, however, J.Z. testified that when she was 13 or 14 years old, in the "seventh or eighth grade," (2004-2006) Zanini had sexual intercourse with her on the side of the road, only this time they were in his Santa Fe vehicle and she was seated her with her legs hanging out of the passenger door, with her derriere on the edge of the passenger seat, while he leaned inside the car. (ECF No. 90-6 at 109–11.) The second amended information alleged sexual intercourse for Count 17 occurring between a greatly expanded time frame: December 13, 2000, and December 12, 2006. (ECF No. 90-8 at 8.) On this record, reasonable jurists could debate whether the second amended information merely expanded the date for the crime corresponding to the initially noticed allegations for Count 17 (sexual intercourse in a white car from behind when she was 12 years old) or instead permitted the State to amend the information to add a new and separate crime of sexual assault (in his Santa Fe vehicle, in a different position when she was 13 or 14 years old) for which there was no prior notice to the defense.

[25]Zanini had two trial attorneys. (ECF No. 44-3 at 19.)

1   performance or the question of prejudice; if the petitioner fails to satisfy either question,

2   the court need not consider the other. *See id.* at 697.

3          "The Sixth Amendment does not guarantee the right to perfect counsel; it promises

4   only the right to effective assistance." *Burt v. Titlow*, 571 U.S. 12, 24 (2013). In considering

5   a claim of ineffective assistance of counsel, a court "must indulge a strong presumption

6   that counsel's conduct falls within the wide range of reasonable professional assistance."

7   *Strickland*, 466 U.S. at 689. On the performance prong, the issue is not what counsel

8   might have done differently but whether counsel's decisions were reasonable from his or

9   her perspective at the time. *See id.* at 689-90. A petitioner making an ineffective

10  assistance claim "must identify the acts or omissions of counsel that are alleged not to

11  have been the result of reasonable professional judgment." *Id.* In considering such claims,

12  a court is obligated to "determine whether, in light of all the circumstances, the identified

13  acts or omissions were outside the wide range of professionally competent assistance."

14  *Id.* Strategic choices made "after thorough investigation of law and facts relevant to

15  plausible options are virtually unchallengeable." *Id.* On the other hand, "strategic choices

16  made after less than complete investigation are reasonable precisely to the extent that

17  reasonable professional judgments support the limitations on investigation." *Id.* at 690-

18  91. It is a petitioner's burden to show "counsel made errors so serious that counsel was

19  not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Id.* at 687. To

20  establish prejudice, it is not enough for the petitioner "to show that the errors had some

21  conceivable effect on the outcome of the proceeding." *Id.* at 693. The errors must be "so

22  serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at

23  687.

24         "Establishing that a state court's application of *Strickland* was unreasonable under

25  § 2254(d) is all the more difficult" as "the standards created by *Strickland* and § 2254(d)

26  are both 'highly deferential,'" and when applied in tandem, "review is 'doubly so.'" *See*

27  *Richter*, 562 U.S at 105 (internal citations omitted); *see also Cheney v. Washington*, 614

28  F.3d 987, 995 (9th Cir. 2010) ("When a federal court reviews a state court's *Strickland*

1  determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply;

2  hence, the Supreme Court's description of the standard as 'doubly deferential.'") (citing

3  *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003)).

4  **2.   Standards for Procedurally Defaulted *Strickland* Claims**

5  Where a petitioner "has defaulted his federal claims in state court pursuant to an

6  independent and adequate state procedural rule," federal habeas review "is barred unless

7  the prisoner can demonstrate cause for the default and actual prejudice as a result of the

8  alleged violation of federal law, or demonstrate that failure to consider the claims will

9  result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750

10  (1991). To demonstrate cause, the petitioner must establish that some external and

11  objective factor impeded efforts to comply with the state's procedural rule. *E.g., Murray v.*

12  *Carrier*, 477 U.S. 478, 488 (1986); *Hiivala v. Wood*, 195 F.3d. 1098, 1105 (9th Cir. 1999).

13  "To establish prejudice, [a petitioner] must show not merely a substantial federal claim,

14  such that 'the errors . . . at trial created a possibility of prejudice,' but rather that the

15  constitutional violation 'worked to his actual and substantial disadvantage.'" *Shinn v.*

16  *Ramirez*, ___ U.S. ___, 142 S. Ct. 1718, 1734–35 (2022) (citing *Carrier*, 477 U.S. at 494

17  and quoting *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original)).

18  The Supreme Court has provided an alternative means to overcome the cause

19  requirement for purposes of overcoming a procedural default for an ineffective assistance

20  of trial counsel claim where a petitioner can show that he received ineffective assistance

21  of counsel in his initial state habeas proceeding. *See Martinez*, 566 U.S. at 9. The

22  Supreme Court outlined the necessary circumstances as follows:

23  [W]here (1) the claim of "ineffective assistance of trial counsel" was
    a "substantial" claim; (2) the "cause" consisted of there being "no counsel"
24  or only "ineffective" counsel during the state collateral review proceeding;
    (3) the state collateral review proceeding was the "initial" review proceeding
25  in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state
    law requires that an "ineffective assistance of trial counsel [claim] . . . be
26  raised in an initial-review collateral proceeding."

27  *Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (quoting *Martinez*, 566 U.S. at 14, 18).

28  A procedural default will not be excused if the underlying ineffective assistance of

1    trial counsel claim "is insubstantial," i.e., lacks merit or is "wholly without factual support."

2    *Martinez*, 566 U.S. at 14-16 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)). In *Martinez*,

3    the Supreme Court cited the standard for issuing a certificate of appealability as

4    analogous support for whether a claim is substantial. *See* 566 U.S. at 14. According to

5    the certificate of appealability standard, a claim is substantial if a petitioner shows

6    "reasonable jurists could debate whether . . . the [issue] should have been resolved in a

7    different manner or that the issues presented were 'adequate to deserve encouragement

8    to proceed further.'" *Miller-El*, 537 U.S. at 336.

9              ### 3.    Ground 10(A) —*Brady* Motion

10            Ground 10(A) alleges trial counsel was ineffective in failing to timely file a motion

11   to dismiss, or alternatively, request a trial continuance, under *Brady* due to the State's

12   late disclosure of the contents of J.Z.'s post-recantation interview with Detectives

13   Swartwood and Abernathy. (ECF No. 36 at 69-72.)

14            Zanini filed a motion to dismiss the charges claiming, *inter alia*, the State had

15   violated *Brady* by withholding the September 25, 2009, post-recantation interview. (ECF

16   No. 42-1 at 212-13); *see also supra* at pp. 45–49. The state district court ruled the

17   interview should have been disclosed to the defense earlier because the police had the

18   recording, but there was no suppression because the prosecutor arranged for it to be

19   produced as soon as she became aware of it and it was produced before trial, and two

20   days before [the] motion was filed. (ECF No. 42-1 at 288-90.) The court pointed out the

21   defense, instead of requesting a continuance, waited until two days after receiving the

22   interview before filing the motion. (*Id.*) Defense counsel explained a continuance was not

23   requested because counsel did not feel it would help the defense, the defense had "no

24   idea" "what additional tactics the State may have tried to use" concerning the recantation,

25   and "it would not remedy the situation that was created." (*Id.* at 291-92.) The court

26   responded: "So you did receive it, you made that determination," and noted the defense

27   could "cross-examine her about it to the extent" necessary, and no additional remedy

28   beyond that was warranted. (*Id.* at 292-93.)

1    At the postconviction evidentiary hearing, trial counsel testified counsel received

2 the audio tape of J.Z.'s last interview with police at close of business on the Monday

3 during the week of trial. (ECF No. 44-3 at 46-47.) Counsel said that the next morning,

4 counsel informed the state district court of Zanini's motion for mistrial based on the late

5 disclosure. (*Id.* at 47-48.) Trial counsel said that, at that point in time, counsel believed

6 dismissal of the charges was the appropriate remedy and saw no benefit to a trial

7 continuance. (*Id.* at 24-25, 47.) Counsel asserted a continuance was not a "smart move"

8 because J.Z. "told three or four different versions" of her story and "[t]o continue the trial

9 would have just allowed another version to come out." (*Id.*) Counsel stated that, due to

10 J.Z.'s pregnancy, a continuance risked an unwanted delay of several months. (*Id.* at 44-

11 45.)

12    On postconviction review, the Nevada Supreme determined Zanini failed to

13 establish either *Strickland* prong:

> 14    We review the district court's resolution of ineffective assistance of
> counsel claims de novo, giving deference to the district court's factual
> 15 findings if "they are supported by substantial evidence and are not clearly
> wrong." *Lader v. Warden,* 121 Nev. 682, 686, 120 P.3d 1164, 1166 (2005).
> 16 "To prevail on a claim of ineffective assistance of trial counsel, a defendant
> must show that counsel's performance fell below an objective standard of
> 17 reasonableness and that counsel's deficient performance prejudiced
> Zanini." *Nika v. State,* 124 Nev. 1272, 1279, 198 P.3d 839, 844 (2008)
> 18 (recognizing the two-prong test enunciated in *Strickland v. Washington,* 466
> U.S. 668, 687–88 (1984)). A defendant has the burden of "demonstrat[ing]
> 19 prejudice by showing a reasonable probability that but for counsel's errors,
> the result of the trial would have been different." *Id.* at 1279, 198 P.3d at
> 20 844. Additionally, if a defendant fails to show either aspect of the test—
> deficient performance or prejudice—the district court need not consider the
> 21 other aspect. *Id.* ("A court need not consider both prongs of the *Strickland*
> test if a defendant makes an insufficient showing on either prong.").
>
> 22
> 23    Counsel is presumed effective and a habeas petitioner must prove
> the factual bases for ineffectiveness by a preponderance of the evidence.
> *Means v. State,* 120 Nev. 1001, 1011–12, 103 P.3d 25, 32–33 (2004).
> 24 "Effective counsel does not mean errorless counsel, but rather counsel
> whose assistance is within the range of competence demanded of attorneys
> 25 in criminal cases." *Jackson v. Warden,* 91 Nev. 430, 432, 537 P.2d 473,
> 474 (1975) (internal quotation marks omitted). Trial counsel "has the
> 26 immediate—and ultimate—responsibility of deciding if and when to object,
> which witnesses, if any, to call, and what defenses to develop." *Rhyne v.*
> 27 *State,* 118 Nev. 1, 8, 38 P.3d 163, 167–68 (2002) (internal quotation marks
> omitted).
>
> 28 . . .

1

2          Zanini argues that his trial counsel was ineffective because, although
           she informed the court that she would be filing a motion to dismiss for *Brady*

3          [FN 2] *Brady v. Maryland*, 373 U.S. 83 (1963).

4          violations based on the untimely disclosure of the interview J .Z. had with
           detectives, she did not insist on having the motion heard prior to selection

5          of the jury. Zanini argues that this prejudiced him because judges are less
           likely to grant motions to dismiss after the jury has been sworn and double

6          jeopardy attaches. Zanini further argues that, alternatively, once his counsel
           received the late discovery, she should have requested a pretrial

7          continuance to adequately investigate whether the State had improperly
           influenced J.Z. as a witness.

8
           Zanini fails to demonstrate that his trial counsel's performance was

9          deficient or that he was prejudiced. On direct appeal, this court concluded
           that no *Brady* violation had occurred because the evidence was not

10         exculpatory, the State disclosed the evidence as soon as it was aware of it,
           and Zanini was still able to use it during cross-examination at trial. *Zanini v.*

11         *State,* Docket No. 55604, at 3 (Order of Affirmance, February 24, 2012).
           This court also concluded that "[t]he district court properly determined that

12         there was no witness tampering that would justify dismissal based on the
           detectives' interview with J.Z." *Id.* Zanini fails to demonstrate a reasonable

13         probability of a different outcome at trial had counsel insisted on having the
           motion to dismiss heard before jury empanelment or requested a

14         continuance upon receipt of the State's late discovery. *See Nika,* 124 Nev.
           at 1279, 198 P.3d at 844. Thus, the district court did not err in denying this

15         claim.

16    (ECF No. 10-26 at 3-5.)

17         The state supreme court's determination is neither contrary to nor constitutes and

18    unreasonable application of *Strickland* and is not based on an unreasonable

19    determination of the facts in the state court record. Counsel's strategy for not requesting

20    a continuance was reasonable at the time of the disclosure for the reasons counsel stated

21    for not seeking one at trial and the postconviction evidentiary hearing. Moreover, it as

22    objectively reasonable to conclude counsel's failure to earlier request dismissal based on

23    a claim that the State violated *Brady* did not prejudice Zanini. As discussed, the State did

24    not suppress the post-recantation statement; it disclosed the interview statement before

25    trial. Moreover, defense counsel was able to use it to expose J.Z.'s statements supporting

26    her recantation and to show the detectives may have pressured J.Z. to recant the

27    recantation. On this record the state supreme court's determination that there is no

28    reasonable probability the result of the proceedings would have been different had

1    counsel filed the motion earlier was objectively reasonable. Zanini is not entitled to federal

2    habeas relief on Ground 10(A).

3              **4.      Ground 10(B)—*Brady* Motion for Prosecutor's Interview**

4              Ground 10(B) alleges trial counsel was ineffective in failing to object to the State's

5    failure to disclose alleged exculpatory statements made by J.Z. on September 18, 2008,

6    to the prosecutor and investigator Fabert. (ECF No. 36 at 72-77.)

7              Zanini fails to establish a substantial claim of ineffective assistance of trial counsel.

8    As discussed in Ground 8(A), the suppression of material exculpatory or impeaching

9    evidence by the State presupposes such material exists and the state court record

10   confirms it does not. *See supra* at pp. 47–53. The prosecutor denied having recorded the

11   September 18, 2009, meeting and denied having any discoverable notes. At trial, Fabert

12   testified he did not record the September 18, 2009, meeting with J.Z. and on cross-

13   examination confirmed he had nothing other than his testimony to offer concerning the

14   discussion he had with J.Z. On cross-examination, Fabert testified J.Z. did not, in his

15   presence, state the allegations were untrue or recant her allegations. Under the

16   circumstances, all reasonable jurists would agree that an objectively reasonable attorney

17   could conclude there existed no discoverable evidence of exculpatory or impeaching

18   statements made to the prosecutor or Fabert during the September 18, 2009, meeting

19   and therefore a *Brady* claim was wholly lacking in merit. For these reasons, Zanini has

20   failed to establish cause under *Martinez* and Ground 10(B) will be dismissed.

21             **5.      Ground 10(C)—Recantation Expert**

22             Ground 10(C) alleges trial counsel was ineffective in failing to retain an expert in

23   the field of child psychology with expertise regarding recantations by child victims of

24   sexual assault to demonstrate the rarity of recantations, rebut the State expert's

25   testimony, and assist with cross-examination. (ECF No. 36 at 77-81.) Zanini fails to

26   establish cause to excuse his procedural default of this claim.

27             On September 21, 2009, the State informed the court and defense counsel that it

28   had noticed an "expert in recant." (ECF No. 38-11 at 3.) That same day, the State noticed

66

Pacult as a witness who would "testify as an expert relating to the conditions and behaviors of victims of sexual abuse by family members and the emotional impact/effects on the victim." (ECF No. 38-7 at 3.) Before trial, the defense moved to preclude Pacult's testimony to the extent it would constitute vouching should Pacult offer to explain why J.Z. might recant her original allegations. (ECF No. 38-15 at 5-6.) At the hearing on the motion, the State explained that the recantation would be presented to the jury regardless of J.Z.'s testimony and Pacult would testify about "the family dynamics and the pressures and the—and that this is consistent with victims of abuse is expressly provided by statute." (ECF No. 38-16 at 13.) The state district court agreed, stating, the statute reads, "In any prosecution for sexual assault, expert testimony is not inadmissible to show that the victim's behavior or mental or physical condition is consistent with the behavior or condition of a victim of sexual assault." (*Id.*) The state district court denied the motion after confirming Pacult had not met with J.Z. and would "talk in general about the type of behavior that you see with victims and maybe particular victims of a certain age . . . he's not going to express an opinion as to whether [J.Z.] is truthful or untruthful." (*Id.* at 14.)

Zanini relies on Exhibit 69 (ECF No. 46-2), a Child Sexual Abuse Investigation Report by Dr. William O'Donohue, Ph.D., LLC, dated January 28, 2020, for his allegations in Ground 10(C) that trial counsel was ineffective in failing to call an expert to testify that recantation is rare; however, Zanini fails to establish that he presented Exhibit 69 or developed it in the state court proceedings. The Supreme Court has recently held that "a federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on ineffective assistance of state postconviction counsel" unless the exceptions set forth in 28 U.S.C. § 2254(e)(2) are satisfied. *Ramirez*, 142 S. Ct. at 1734 ("Only rarely may a federal habeas court hear a claim or consider evidence that a prisoner did not previously present to the state courts in compliance with state procedural rules."). The requirements of § 2254(e)(2) are that:

(A) the claim relies on—

(i) a new rule of constitutional law, made retroactive to cases

on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2)(A)-(B). Where § 2254(e)(2) applies and the prisoner cannot satisfy its stringent requirements, "a federal court may not hold an evidentiary hearing—or otherwise consider new evidence—to assess cause and prejudice under *Martinez*." *Ramirez*, 142 S. Ct. at 1738-39 (relying on *Holland*, 542 U.S. at 653 and *Williams*, 529 U.S. at 433).

Because Zanini has failed to show that he presented or developed Exhibit 69 during the state court proceedings and fails to establish he can meet the requirements of § 2254(e)(2), the Court may not consider Exhibit 69 in considering whether Zanini has established cause and prejudice sufficient to excuse the procedural default of this ineffective assistance of counsel claim. Considering only the state court record, Zanini has not shown cause or prejudice under *Martinez* because his claims that counsel should have consulted an expert to refute Pacult's testimony and educate counsel for cross-examination are insubstantial. Defense counsel's failure to call an expert to testify that recantations are rare was objectively reasonable given that Pacult in no way testified about the frequency or infrequency of recantations in child sexual abuse cases and his testimony was confined to general testimony about the types of behavior seen in victims of sexual abuse. (ECF No. 42-1 at 240-61.) For these reasons, Zanini has failed to establish cause under *Martinez* and Ground 10(C) will be dismissed.

### 6.    Ground 10(D)—Zanini's Medical Limitations

Ground 10(D) alleges trial counsel was ineffective in failing to obtain and investigate Zanini's medical records for the time period of 2002 to 2005 to show Zanini was physically and psychologically incapable, or unlikely to commit the abuse alleged by J.Z. (ECF No. 36 at 81-83.)

68

1    At trial, Margie testified Zanini had "a bad" automobile accident in June of 2002,

2    and suffered neck and back injuries, was permanently disabled with four screws in his

3    back and four screws in his neck and had two surgeries within a six-month period in 2003.

4    (ECF No. 90-9 at 55, 87.) Ronnie testified that after the accident, Zanini had a hard time

5    getting around, wore a brace for his back for a "year or two after the accident," required

6    assistance for "a good deal of time," sometimes slept on the couch, more comfortably

7    slept on a recliner, and was still permanently disabled as a result of the accident. (*Id.* at

8    170-75.) Margie additionally testified about her sex life with Zanini following the accident:

9         Q    You were interviewed about your sex life, right?

10        A    Yes.

11        Q    An in spite of his accident, he was able to have sex, correct?

12        A    Yes.

13        Q    And you said about once a month?

14        A    Yes.

15        . . .

16        Q    And that you had sex with him only in your room?

17        A    Well, no, not only in my room. But we—yes, we had it in my
18             room after the accident.

19   (*Id.* at 103.)

20        According to Zanini's medical records, his automobile accident occurred in June

21   of 2002 (when J.Z. was 9 years old), and he was capable of driving short distances

22   following the accident. (ECF No. 48 at 220.) In Zanini's pain management questionnaire

23   dated November of 2002, he indicated "[his] sex life was nearly absent because of pain."

24   (*Id.* at 188.) His medical records indicate he had multiple surgeries on his spine and neck,

25   with the latest occurring November 18, 2004, followed by nerve blocks and pain

26   management treatment in 2005. (*Id.* at 48.)

27        For purposes of Count 17, J.Z. testified that sometime between 2004–2006, when

28   she was 13 or 14 years old and in the "seventh or eighth grade," Zanini had sexual

1   intercourse with her in his vehicle on the side of the road.[26] (ECF No. 90-6 at 109-11.)

2   She said Zanini seated her with her legs hanging out of the passenger door, with her

3   derriere on the edge of the passenger seat, and that he leaned inside the car, "stuck his

4   penis in [her] vagina," and ejaculated in the gutter. (*Id.*)

5          At the postconviction evidentiary hearing, defense counsel testified she was aware

6   of Zanini's back surgeries because Zanini told counsel that, due to his injuries, he

7   occasionally slept on the floor and was unable to obtain an erection. (ECF No. 44-3 at 13-

8   15.) Counsel did not obtain Zanini's medical records. (*Id.* at 16-17, 38.) Counsel agreed

9   "It's possible that had I subpoenaed the medical records there could have been something

10  in there that" could have been used to refute the allegations that Zanini sexually assaulted

11  J.Z. by having sexual intercourse with her in the car (as alleged in Count 17) (*Id.* at 17-

12  20.) Counsel testified, however, that the strategy was focused on the "great impeachment

13  evidence" for J.Z. that counsel believed presented a much stronger defense:

14          A        My recollection is that we—and—my recollection is that—and
            I use the term we loosely, that we had decided that we had a lot of great
15          impeachment evidence on [J.Z.]. And to just get up there and just point out
            to the jury that she's just not a believable person was a much stronger
16          defense than to piecemeal it with, well, he couldn't have this count or this
            count because of back injuries. Because in addition to counts involving
17          sexual intercourse, there were counts involving digital penetration and
            cunnilingus where the back—potential back injury would not necessarily
18          have been a solid defense to those counts, so we decided that just attacking
            her credibility en masse was a much stronger defense. That being said, he
19          was convicted of three counts of sexual intercourse, not digital penetration,
            not cunnilingus, not fellatio, so—
20

21  (*Id.* at 20.) Counsel further testified the defense strategy "was much more [J.Z.] cannot

22  be believed" and that to "piggyback" a defense that "even if you do believe her he couldn't

23  have done this because he's physically incapable" in counsel's opinion "lessens the

24  strength of the defense." (*Id.* at 38.) Counsel said the preference in this particular case

25  was to "put all of your effort into the one theory of defense" because "to piecemeal it out

26  . . . lessens the strength of Zanini case." (*Id.* at 38-39.)

27

28          [26]J.Z. testified she was 14 years old in November of 2007, just before her birthdate,
            and that she was 15 years old in July of 2008. (ECF No. 90-6 at 56, 96-97.)

1    The Nevada Supreme Court determined that Zanini failed to establish either

2    deficient performance or prejudice under *Strickland*:

3         Prior to trial, Zanini's counsel learned that he had been in a serious
     auto accident in 2002 where he fractured his back and neck. Zanini argues
4    that his counsel was ineffective for failing to further investigate his accident
     and obtain medical records to establish that he physically could not have
5    performed some of the sex acts described in the counts charged against
     him. Zanini further argues that the medication he was on reduced his desire
6    for sex. However, as Zanini concedes, he was only convicted of one of the
     counts for which his medical limitations could have served as a potential
7    defense. And Zanini's wife testified that they still engaged in sexual activity
     at least monthly after the accident occurred. Zanini fails to demonstrate that
8    his trial counsel's performance was deficient or that he was prejudiced.

9         Additionally, Zanini's trial counsel testified at the evidentiary hearing
     that she decided to present one strong theory of defense—J.Z.'s lack
10   credibility—and that bringing in the medical argument would weaken that
     defense.   "Tactical   decisions   are   virtually   unchallengeable   absent
11   extraordinary circumstances." *Ford v. State,* 105 Nev. 850, 853, 784 P.2d
     951, 953 (1989). Zanini fails to demonstrate a reasonable probability of a
12   different outcome at trial had counsel further investigated his accident and
     obtained his medical records. *See Nika,* 124 Nev. at 1279, 198 P.3d at 844.
13   Thus, the district court did not err in denying this claim.

14   (ECF No. 10-26 at 7-8.)

15    The state supreme court's application of *Strickland*'s prejudice prong is objectively

16   reasonable. Zanini's medical records show he had a traffic accident in 2002, received

17   surgery in 2004, and was treated for pain management. Nothing in the medical records

18   suggests Zanini was incapable of performing sexual intercourse during 2008 for purposes

19   of Counts 1 and 2. J.Z. testified he engaged her in sexual intercourse in his vehicle, as

20   alleged for Count 17, when she was in "seventh or eighth grade," which translates to the

21   time period of 2004–2006 but nothing in the medical records indicates he was incapable

22   of sexual intercourse in 2006. Moreover, although Margie did not testify to what kind of

23   sex Zanini was able to perform following his accident, it was reasonable for the state

24   supreme court to conclude Margie's testimony that they had sex once a month included

25   sexual intercourse. Accordingly, it was reasonable for the state supreme court to conclude

26   there is no reasonable probability the result of the proceeding would have been different

27   had counsel obtained Zanini's medical records and presented them at trial. Zanini is not

28   entitled to federal habeas corpus relief for Ground 10(D).

71

1   **V.      CERTIFICATE OF APPEALABILITY**

2        This is a final order adverse to Zanini. Rule 11 of the Rules Governing Section

3   2254 Cases requires this Court to issue or deny a certificate of appealability ("COA"). This

4   Court therefore has *sua sponte* evaluated the claims within the petition for suitability for

5   the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-

6   65 (9th Cir. 2002). Under § 2253(c)(2), a COA may issue only when the petitioner "has

7   made a substantial showing of the denial of a constitutional right." With respect to claims

8   rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find

9   the district court's assessment of the constitutional claims debatable or wrong." *Slack*,

10   529 U.S. at 484 (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). Applying this

11   standard, a certificate of appealability is warranted for Ground 9 to the extent it raises

12   claims related to the convictions on Counts 1 and 17. *See Slack,* 529 U.S. at 484. A COA

13   is denied for all other grounds as jurists of reason would not find it debatable or wrong

14   whether the Court is correct in its procedural ruling dismissing grounds 2, 8(A), 10(B) and

15   10(C) as procedurally defaulted for the reasons stated above and in the Court's prior order

16   (ECF No. 64).  Reasonable jurists would furthermore not find the Court's assessment of

17   grounds 1, 3, 4, 5, 6, 7, 8(B), the portion of 9 for which a COA is not granted, 10(A), and

18   10(D), debatable or wrong.

19   **VI.     CONCLUSION**

20        It is therefore ordered that grounds 1, 3, 4, 5, 6, 7, 8(B), 9, 10(A), and 10(D) are

21   denied on the merits; grounds 8(A), 10(B) and 10(C) are dismissed with prejudice; and

22   the Petition (ECF No. 36) is denied with prejudice.

23        It is further ordered that a certificate of appealability is denied as to all grounds

24   except for Ground 9 to the extent it raises claims for convictions on Counts 1 and 17.

25        It is further ordered that all requests for an evidentiary hearing (ECF No. 36 at 84)

26   are denied.

27        The Clerk of Court is directed to substitute Tim Garrett for Respondent Warden

28   Baker.

1        The Clerk of the Court is directed to enter judgment accordingly and close this

2    case.

3        DATED THIS 21st Day of February 2023.

4        _____

5        MIRANDA M. DU
         CHIEF UNITED STATES DISTRICT JUDGE
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

73